John Calvin TAYLOR, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–80–624.

Court of Criminal Appeals of Oklahoma.

May 4, 1982.

Rehearing Denied June 2, 1982.

David Luther Woodward, Sp. Counsel, Appellate Public Defender Project, Norman, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Crim. Appellate Div., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

The appellant was convicted by jury for Unlawful Delivery of a Controlled Substance in the District Court of Comanche County. He was sentenced to five (5) years' imprisonment and fined $2,500.00.

James Mainard, a military police officer working with a United States Army Central Intelligence Division (C.I.D.) drug suppression team at Fort Sill, was investigating two enlisted men's participation in drug trafficking. Mainard asked the Lawton Police Department for assistance when his investigation led to an off-base source. The Lawton police provided him with money to make the undercover drug purchase and outfitted Mainard with a radio transmitter. The police arrested the appellant, a civilian, immediately after Mainard bought drugs from him at an off-base residence.

The appellant argues his arrest was illegal because it was obtained in direct violation of the Posse Comitatus Act, 18 U.S.C., § 1385, and that all evidence garnered pursuant to the arrest should have been excluded.

This statute was enacted during Reconstruction. It was designed to prohibit civil authorities from using federal troops to police state elections in ex-Confederate states where civil power had been re-established. See *United States v. Hartley*, 486 F.Supp. 1348 (D.C.Fla.1980). In tracing the legislative history of the Act, the federal district court in *United States v. Red Feather*, 392 F.Supp. 916, 922 (D.C.S.D.1975), wrote that "[o]f primary concern was the prospect of U.S. Marshals, on their initiative, calling upon troops to form a posse or to otherwise perform direct law enforcement functions to execute the law."

Our research of current case law indicates the Act, which prohibits use of military personnel for enforcement of civil law, retains its vitality.[1] Section 1385 provides:

Whoever, except in cases and under circumstances expressly authorized by the constitution or act of Congress, willfully uses any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more

---

1. See *United States v. Hartley*, supra; *State v. Nelson*, 298 N.C. 573, 260 S.E.2d 629 (1979); *People v. Burden*, 94 Mich.App. 209, 288 N.W.2d 392 (1979); *United States v. Walden*, 490 F.2d 372 (4th Cir. 1974), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760, *rehearing denied*, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148.

than $10,000.00 or imprisoned not more than two years, or both.

■ The pivotal question in this appeal is whether this Court should invoke a prophylactic exclusionary rule to remedy alleged violations of Section 1385. We find that violations of the Posse Comitatus Act do not warrant invocation of an exclusionary rule.

In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court formulated an exclusionary rule for evidence obtained in violation of the Fourth Amendment. The purpose of this exclusionary rule is to deter "unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). This judicially created remedy was considered necessary due to the fundamental liberty interest guaranteed in the Fourth Amendment and because the alternative remedies for Fourth Amendment violations proved ineffectual.

Violations of Section 1385 do not necessitate an automatic invocation of an exclusionary rule. The statute itself provides criminal sanctions for any violations of the Act. Secondly, the potential abuses of the Act obviously are not of the same magnitude, neither qualitatively nor quantitatively, as violations under the Fourth Amendment. Finally, the Act "expresses a policy that is for the benefit of the people as a whole, but not one that may be characterized as expressly designed to protect the personal rights of defendants." *United States v. Walden*, 490 F.2d 372, 377 (4th Cir. 1974).

Other jurisdictions dealing with § 1385, have held that violations of this Act do not require applications of an exclusionary rule. See *State v. Trueblood*, 46 N.C.App. 541, 265 S.E.2d 662 (N.C.1980); *State v. Nelson*, 298 N.C. 573, 260 S.E.2d 629 (1979); *State v. Danko*, 219 Kan. 490, 548 P.2d 819 (1976). Contra, *People v. Burden* 94 Mich.App. 209, 288 N.W.2d 392 (1979).

However, it does not necessarily follow that all evidence obtained in violation of the Act will be admissible. This Court is compelled to examine each case involving a violation of the Posse Comitatus Act and determine whether the illegal conduct by the law enforcement personnel rises to an intolerable level as to necessitate an exclusion of the evidence resulting from the tainted arrest. We find that this case by case determination is preferable to a per se exclusionary rule.

This Court on three prior occasions has had the opportunity to examine the effect of Posse Comitatus Act upon state criminal prosecutions. *Lee v. State*, 513 P.2d 125 (Okl.Cr.1973), *Hilde-Brandt v. State*, 507 P.2d 1323 (Okl.Cr.1973); *Hubert v. State*, 504 P.2d 1245 (Okl.Cr.1972). In each of these cases we affirmed the convictions and found that the military personnel assumed no greater authority than that of a private citizen and were therefore competent witnesses irrespective of Section 1385.

In *People v. Burden*, 94 Mich.App. 209, 288 N.W.2d 392 (1979), Judge Walsh in dissent stated:

> . . . noninterference by the military in civilian affairs—is to be jealously guarded. The Posse Comitatus Act arose in a particular historical and political context but it is not an anachronistic relic of an historical period the experience of which is irrelevant to the present. It embodies the very important, pervasive, and continuing American preoccupation with assurance of the separation of civilian and military spheres of authority and the aversion to intrusion of the military into civilian matters. (Citations omitted.)

Furthermore, in *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the Supreme Court articulated that a basic tenet of our Republic is the nonintervention of the military in the civil sector. The Supreme Court observed:

> The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities . . . reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tra-

dition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. These prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied. supra. 408 U.S. at 15–16, 92 S.Ct. at 2326–27.

Under the present facts we hold that the military intervention was excessive and cannot be condoned by this Court. Here, Mainard, a military police officer, actively participated in the undercover drug purchase. He also pulled a gun during the arrest. Even more offensive is Mainard's active participation in the search of the appellant's house after the arrest. Lastly, he personally delivered the drugs to the O.S.B.I. and filled out the submittal forms. Mainard did not participate as a private citizen, but instead acted solely under the authority of his military status.

The authority assumed by the military agent, Mainard, intolerably surpassed that which was present in *Hubert, Hildebrandt,* and *Lee,* supra. Therefore, we rule it necessary to suppress the evidence obtained pursuant to the unlawful arrest.

Accordingly, the judgment and sentence is REVERSED and REMANDED.

BRETT, P. J., concurs.

BUSSEY, J., dissents.

BUSSEY, Judge, dissents:

I must respectfully dissent. Most of the acts performed by Mainard were acts which could have been performed by a private citizen acting in cooperation with police authorities. See, *Hubert, Hildebrandt,* and *Lee,* supra.