Byong Hak KIM, Petitioner,

v.

STATE of Alaska, Respondent.

Hyo J. MOON, Petitioner,

v.

STATE of Alaska, Respondent.

Nos. S–3741, S–3744.

Supreme Court of Alaska.

Sept. 5, 1991.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

ORDER

IT IS ORDERED:

The order of September 5, 1990, granting the petition for hearing in these cases, is vacated as improvidently granted. The petition is denied.

RABINOWITZ, C.J., with whom COMPTON, J., joins, dissents, for the reasons expressed in the attached dissenting opinion.

RABINOWITZ, Chief Justice, with whom COMPTON, Justice, joins, dissenting.

I dissent from the court's dismissal of the petition as improvidently granted. In my view, the Anchorage police may not solicit the Army's direct assistance to enforce state laws against civilians in a civilian area. To employ such assistance is a violation of the Posse Comitatus Act, related statutes and implementing regulations. Based on my study of the record, I would grant the petition, hold that the Act had been violated, and require the exclusion of all evidence obtained with the Army's illegal assistance.

FACTS

Petitioners do not contest the facts set out in *Moon v. State*, 785 P.2d 45, 45–46 (Alaska App.1990).[1]

In early 1986, the Anchorage Police Department (APD) became concerned about drug dealing at the Palace Hotel located on 4th Avenue in Anchorage, Alaska. The city filed a civil suit to close down the Palace Hotel as a public nuisance. *Anchorage v. Yon–Hong Lee*, 3AN–86–1424CIV. The police also began a criminal investigation of the Palace Hotel. A search was conducted of the Palace Hotel in February, per a search warrant. The scope of the search involved drugs and stolen property. Noting that drug dealing at the Palace Hotel seemed to target enlisted military personnel, on February 20, 1986, Lt. Thomas Walker of the Anchorage Police Department Crisis Intervention Response Team (CIRT) approached the United States Army Criminal Investigation Division (CID) at Fort Richardson, seeking assistance. He advised military authorities that cocaine and marijuana were being regularly sold to soldiers at Fort Richardson by dealers operating out of the Palace Hotel.

On February 21, 1986, special agents with the United States Army Drug Suppression Team (DST), attempted to verify Walker's information. According to the military reports of the investigation, "DST members, presenting a military appearance, walked by the area of the Palace Hotel and were solicited several times to purchase marijuana and cocaine." The report states that other soldiers were seen buying drugs in the vicinity of the Palace Hotel and that cars with Fort Richardson registration stickers were also seen in the area. The activities observed by DST personnel were also consistent with information independently developed by the military authorities.

Having satisfied themselves that people associated with the Palace Hotel were engaging in drug trafficking with military personnel, the local military authorities sought and obtained permission from the United States Army Criminal Investigation Division Command for the Sixth Region in San Francisco, and the United States Army Criminal Investigation Command in Falls Church, Virginia, to undertake a joint criminal investigation with the Anchorage Police Department.

In early March 1986, Anthony Henry, a special agent in the United States Army Criminal Investigation Command was assigned to travel from his base in Colorado to Anchorage to assist with the investigation of the Palace Hotel. Agent Henry was briefed by other military and civilian investigators. He quickly became the center of the investigation which led to the charges in this case. Working undercover, Agent Henry posed as an enlisted soldier interested in buying drugs expressly for resale on Fort Richardson and Fort Wainwright which is located outside of Fairbanks, Alaska. Throughout the Palace Hotel investigations, Agent Henry was primarily assisted by three other law enforcement officers, Investigator Brady (DST), Investigator Elskamp (DST), and Officer Decker (APD). From March 13 until roughly May 13, Agent Henry made numerous

1. The facts underlying Kim's petition are identical for purposes of my review.

purchases of cocaine at the Palace Hotel. The evidence he procured and the testimony he gave, led to the conviction of Hyo J. Moon.

Petitioners emphasize that this criminal investigation was initiated by local law enforcement authorities, and that the Anchorage Police sought military assistance as a matter of convenience. As the state notes, the police wanted Army assistance to obtain an undercover agent who looked like a G.I., and also because the department's covert officers were already well known in the area.

Further, while the court of appeals concluded that soldiers were "a market" for illegal drugs, that court did not find, and neither do petitioners concede, that soldiers were the sole market at the Hotel. Apparently "only civilians were prosecuted as a result of this investigation," and no "specific action" has been taken by military authorities against military personnel as a result. *Moon,* 785 P.2d at 48.

DISCUSSION

I. *The Violation of the Posse Comitatus Act.*

The Posse Comitatus Act, 18 U.S.C. § 1385 (1979) ("the Act") provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The state does not contend that this record presents an express Congressional or Constitutional exception to the Act. Neither does the state assert that the use of the Army Drug Suppression Team either by the Anchorage police or by the Army itself was not "wilful." [2] Furthermore, the state does not contend that the Army was not used "as a posse comitatus *or otherwise.*" [3] 18 U.S.C. § 1385 (Emphasis added). Rather, the state argues that the military assistance in this case was not "regulatory, proscriptive, or compulsory in nature" and therefore not violative of the Act.

This contention is inept. The use of military personnel for surveillance or as undercover agents is "direct participation" in violation of the Act, 10 U.S.C. § 375 (1988), and 32 C.F.R. § 213.10(a)(3) (1990). 10 U.S.C. § 375, "a corollary to the posse comitatus act," [4] requires

> [t]he Secretary of Defense [to] prescribe such regulations as ... ensure that any activity (including ... the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army ... in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

Pursuant to this statute the Secretary has specifically prescribed 32 C.F.R. § 213.-10(a)(3):

> (3) *Restrictions on Direct Assistance.* Except as otherwise provided in this en-

**2.** A will to violate the Act is not required, but only the wilful use of military personnel. *Accord United States v. Walden,* 490 F.2d 372, 373, 376 (4th Cir.), *cert. denied,* 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 *r'hng denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974) (Navy regulation incorporating Act "innocently" violated by wilful use of military personnel to make illegal weapons purchases undercover); *State v. Danko,* 219 Kan. 490, 548 P.2d 819, 822 (1976) (Act may be violated despite officers' apparent ignorance of Act's proscription). Whether a violation is wilful is relevant, if at all, to the remedy. See Part II, *infra.*

**3.** Courts declining to apply the Act to military participation on a scale less than a posse comitatus err in ignoring the "or otherwise" portion of the statute. *Contra, e.g., Hildebrandt v. State,* 507 P.2d 1323, 1325 (Okla.Crim.App.1973) (defining only "posse comitatus"); *Hubert v. State,* 504 P.2d 1245, 1246 (Okla.Crim.App.1972) (same). Similarly, the Act is not limited to military action of the scale which apparently inspired Congress to make the Constitutional limits of domestic military power explicit. *Contra, e.g., People v. Wells,* 175 Cal.App.3d 876, 221 Cal.Rptr. 273, 275 (1985); *see Walden,* 490 F.2d at 375.

**4.** *State v. Short,* 113 Wash.2d 35, 775 P.2d 458, 459 (1989); *see also id.* at 460 ("Because the limitations on the use of the armed services contained in 10 U.S.C. § 375 correspond closely with those in the posse comitatus act, the same analysis should apply.").

closure, the prohibition on the use of military personnel "as a posse comitatus or otherwise to execute the laws" prohibits the following forms of direct assistance:

. . . .

(ii) A search or seizure.

. . . .

(iv) Use of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators.

The Posse Comitatus Act, its related statutes and regulations thus do not require that civilians be "coerced or intimidated by a show of military force," as the state contends; neither does the Act absolve military participation which stops short of "permeating" or "pervading" the operation.[5] Rather, the Act applies equally by its terms to cases where civilian authorities use elements of the military as a matter of convenience, or to play bit-roles in state investigations.

In sum, Army personnel may not provide direct assistance as prohibited in 10 U.S.C. § 375 and 32 C.F.R. § 213.10(a)(3) unless otherwise authorized by law. The state cites no such authorization here. The state's implicit reliance upon a regulation expressly limited to indirect assistance is patently inadequate to authorize the direct assistance in this case. *See* 32 C.F.R. § 213.10(a)(7)(ii) (approving indirect assistance which does not "subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature").

Neither may the military's direct participation be excused, as the state contends, because "the Army has a strong interest in preventing the introduction of illegal drugs onto military installations."[6] The Act requires more than "strong" or "valid"[7] motivations: absent the specific authorization of Congress, the military execution of civilian laws is excused only if such actions are "taken for the *primary* purpose of furthering a military or foreign affairs function of the United States." 32 C.F.R. § 213.-10(a)(2)(i) (emphasis added). The state does not here allege, nor did the superior court or court of appeals conclude, that the primary purpose of this investigation was to further a military function. The state thus misconstrues, and the superior court and court of appeals have misapplied, the law upon these facts.[8] It simply is not a "military function" to enforce state criminal statutes against civilians in a city hotel. That the Army has a significant, valid, and of course "independent"[9] interest in the

---

**5.** *Contra, e.g., United States v. Bacon,* 851 F.2d 1312, 1313 (11th Cir.1988) ("We hold that assistance by the military in civil investigations, as here, is not a violation of the Posse Comitatus Act in that the military participation in this case did not pervade the activities of civilian officials, and did not subject the citizenry to the regulatory exercise of military power."); *id.* at 1314 ("There was no 'military permeation of civilian law enforcement.'") (quoting *United States v. Hartley,* 678 F.2d 961, 978 (11th Cir. 1982) *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983)); *United States v. Casper,* 541 F.2d 1275, 1278 (8th Cir.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977) (no violation absent "regulatory, proscriptive, or compulsory" exercise of military power). "Execution" under the Act can require no more than "direct participation" under 10 U.S.C. § 375. *Contra, e.g., Burns v. State,* 473 S.W.2d 19, 21 (Tex.Crim.App.1971) (defining "execution" to require completion of enforcement activity).

**6.** In our previous cases, there were substantial physical connections to military installations.

*See McNeil v. State,* 787 P.2d 1036 (Alaska App. 1990) (intoxicated motorist stopped by military police officer on highway on military reservation); *Municipality of Anchorage v. King,* 754 P.2d 283 (Alaska App.1988) (air force special police officer arrested intoxicated motorist at base entrance gate); *Harker v. State,* 663 P.2d 932 (Alaska 1983) (military police arrested fleeing felon on military base).

**7.** The state and the court of appeals characterize this interest as "a valid military interest."

**8.** In my view, the court of appeals erred in requiring only that the state demonstrate "a valid military purpose" justifying military participation. *Moon,* 785 P.2d at 48. The primary purpose exception must be read narrowly or it will swallow all restrictions on military execution of civilian laws.

**9.** Insofar as the Army is an independent entity, it has "independent" concerns regarding its own active members. The Act does not read, however, that the Army may not execute civilian laws except where soldiers are involved. Sol-

health and safety of its personnel does not establish a "military function" to serve that interest by using elements of the Army to execute civilian laws.

The challenge of the Act is to recognize the distinct spheres of influence of civil and military authority, between which both soldiers and civilians often pass. Only a primary military purpose, construed expressly at the expense of all competing civilian law enforcement purposes,[10] justifies military intrusion into the civilian sphere.[11]

## II. The Remedy

This court, of course, is without authority to enforce the penal terms of a federal act. Nevertheless, an apparent violation of the Act is not without potential remedy in a state court proceeding. That remedy is the exclusion of illegally obtained evidence.

As noted in *Harker v. State*, 663 P.2d 932, 935 (Alaska 1983), the exclusionary

remedy of Alaska Rule of Evidence 412[12] may apply to violations of the Posse Comitatus Act.[13] Rule 412 does not "automatically appl[y]," however; rather, we "balance the purpose behind excluding illegally obtained evidence with the interest in admitting reliable evidence in those proceedings." *Harker*, 663 P.2d at 935 (citation omitted); *cf. Taylor v. State*, 645 P.2d 522, 524 (Okla.Crim.App.1982) (case-by-case analysis under federal standards). As noted at the outset, I would grant the petition so that this court may strike this balance in the context of the violation of the Act in this case.[14]

> Here, [the interests precluding admission of the evidence] are more societal and governmental than strictly individual in character. They concern the special threats to constitutional government inherent in military enforcement of civilian law. . . .

---

diers' non-military activities off-base cannot extend the military's limited power to execute civilian laws under the Act. *Contra, e.g., People v. Taliferro*, 166 Ill.App.3d 861, 117 Ill.Dec. 696, 699, 520 N.E.2d 1047, 1050, *appeal denied*, 121 Ill.2d 584, 122 Ill.Dec. 445, 526 N.E.2d 838 (1988); *People v. Burden*, 411 Mich. 56, 303 N.W.2d 444, 446–47 (1981); *Hubert*, 504 P.2d at 1246–47. *Accord, e.g., Taylor v. State*, 645 P.2d 522, 525 (Okla.Crim.App.1982).

**10.** 32 C.F.R. § 213.10(a)(2)(i) provides that the "primary purpose of furthering a military or foreign affairs function" exception "must be used with caution, and does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise *serving as a subterfuge* to avoid the restrictions of the Posse Comitatus Act." The regulation thus requires this court to identify a single primary purpose of the Army's actions—either to "further[ ] a military or foreign affairs function" or to "aid[ ] civilian law enforcement." In contrast, by failing to prioritize competing civilian and military purposes, the "valid military purpose" test endorsed by the state and applied by the court of appeals assigns the label "independent" in the place of "primary," thus preordaining that any "benefits to civilian authorities" will be "incidental" in nature. 32 C.F.R. § 213.-10(a)(2)(i).

**11.** The state's contention that the Army's participation was "intended to lead to [an] official action" and is therefore beyond the ambit of the Act must be analyzed in similar terms. *See* H.R.Rep. No. 71, 97th Cong., 1st Sess. 3, pt. 2 at 8 n. 1, U.S.Code Cong. & Admin.News 1981, 1781, 1791, quoted in relevant part in *Moon*, 785

P.2d at 47 n. 1. That the military "was considering making the Palace Hotel off limits to military personnel when it got involved" does not demonstrate that the primary purpose of the investigation was to further a military function. Even assuming that the House report upon which the state relies indeed creates such an "official action" exception, that exception must be narrowly construed to prevent military intrusions into the domain of civilian law enforcement which are not essential to the military's mission.

Neither may the willful use of military personnel to execute civilian law be excused by describing the soldier as a civilian. *Contra, e.g., Lee v. State*, 513 P.2d 125, 126, (Okla.Crim.App. 1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974).

**12.** Alaska Rule of Evidence 412 provides that "evidence illegally obtained shall not be used over proper objection by the defendant in a criminal prosecution for any purpose except" where appropriate in prosecutions for perjury.

**13.** *Contra People v. Hayes*, 144 Ill.App.3d 696, 98 Ill.Dec. 911, 913, 494 N.E.2d 1238, 1240 (1986) (misciting *Harker*).

**14.** It would weigh in favor of exclusion if the solicitation of military assistance to enforce civilian laws were shown to be common or continuing practice. *Compare Walden*, 490 F.2d at 377 *with Bacon*, 851 F.2d at 1314 (implicitly condoning military participation "to the extent normally performed in the ordinary course of . . . duties").

472

Civilian rule is basic to our system of government. . . .

The interest in limiting military involvement in civilian affairs has a long tradition beginning with the Declaration of Independence. . . .

*Bissonette v. Haig,* 776 F.2d 1384, 1387 (8th Cir.1985), *aff'd on rehearing,* 800 F.2d 812 (7th Cir.1986) (en banc), *aff'd,* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988).

Counsel cite only one case in which evidence obtained in violation of the Act was excluded.[15] No case has been cited in which a violation resulted in prosecution.[16] Research reveals a growing plethora of exceptions condoning direct military participation in the enforcement of civilian laws against nonmilitary targets in nonmilitary areas. Nevertheless, where the sole targets of the investigation are civilian; where the investigation takes place entirely off any military base or installation; where the Army serves at the behest and admitted mere convenience of civil authorities; and where no military function less general than the health and efficiency of Army personnel is advanced to justify direct military participation, no exception to the Posse Comitatus Act is appropriate, and the exclusionary rule should apply "to remove incentives for governmental intrusions into protected areas," Alaska R.Evid. Commentary at 364, if not also "to breathe life" into the federal constitutional guarantees which underly the Act, and the state constitutional guarantees which protect Alaskans from unreasonable searches and seizures. *See Walden,* 490 F.2d at 375, 376 & n. 7; Alaska Constitution art. I § 14.

---

**15.** *Taylor v. State,* 645 P.2d 522 (Okla.Crim.App. 1982).

**16.** *See, e.g., City of Airway Heights v. Dilley,* 45 Wash.App. 87, 724 P.2d 407, 408 (1986) ("Nor is there authority that a prosecution [has ever been] pursued for violation of the act.").