Dear Senator Herbert,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
1. What are the limits of the jurisdiction of both militarypolice and sheriffs on land in which the United States holds apossessory interest, yet is not within its legislativejurisdiction?
 2. May military police transport a person who was detained ona military base for violations of state law to the county jail?If the answer is no, does the sheriff have a duty or other legalobligation to transport the person to the county jail?
 I. Jurisdiction Of The United States And The State Of Oklahoma Over Land In Which The United States Has A Proprietary Interest
¶ 1 Pursuant to Article I of the United States Constitution, the United States may obtain exclusive legislative jurisdiction over land within a state with the consent of that state. HumblePipe Line Co. v. Waggonner, 376 U.S. 369, 371 (1964). Article I provides that Congress shall have the power:
 To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings[.]
U.S. Const. art. I, § 8, cl. 17 (emphasis added).
¶ 2 To clarify the process by which such transfers take place, Congress enacted 40 U.S.C. § 255, which provides, in pertinent part:
 Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction
over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.
Id.
¶ 3 This statute allows the federal government to acquire exclusive or partial jurisdiction over land within a state with the state's consent.[1] Id. Whether the United States exercises any degree of jurisdiction over such land is contingent upon the federal government's acceptance of the transfer of jurisdiction in addition to the state's consent. Id. For this acceptance to be effective, the United States must file an express acceptance in accordance with the statute. Id. Without this express filing, it is presumed that the United States has not accepted jurisdiction, and the United States may not obtain any degree of legislative jurisdiction. Adams v. United States,319 U.S. 312, 315 (1943).[2] Therefore, the United States may exercise exclusive legislative jurisdiction over land owned by the Department of Defense only if the state has consented to such a transfer of jurisdiction and the United States has accepted the transfer of jurisdiction.
¶ 4 The Oklahoma statutes governing consent and cession of jurisdiction to the federal government are found at 80 O.S.2001, §§ 1-13. In enacting 80 O.S. 2001, § 1[80-1], the Oklahoma Legislature has given its consent, in accordance with Section 8 of Article I of the United States Constitution, to the United States' exercise of exclusive jurisdiction over lands acquired for "custom houses, post offices, arsenals, forts, magazines, dockyards, military reserves, irrigation or drainage projects, municipal water facilities or for needful public buildings." A.G. Opin. 96-11, 27 (quoting 80 O.S. Supp. 1995, § 1[80-1](A)). Further, the Legislature provided that:
 Power is hereby conferred upon Congress of the United States to pass such laws and to make or provide for the making of such rules and regulations of both a civil and criminal nature, and provide punishment therefor, as in its judgment may be necessary for the administration, control and protection of such lands as may be from time to time acquired by the United States under the provisions of this act.
80 O.S. 2001, § 7[80-7] (emphasis added).
¶ 5 However, the Legislature has said:
 The State of Oklahoma shall retain a concurrent jurisdiction with the United States in and over any lands acquired, so far that civil process in all cases, and such criminal process as may issue under the authority of the State of Oklahoma against any person charged with the commission of any crime without or within said jurisdiction, may be executed thereon in like manner as if this act had not been passed.
80 O.S. 2001, § 6[80-6] (footnote omitted) (emphasis added).
¶ 6 These statutes represent an offer by the State of Oklahoma to the United States to exercise jurisdiction over lands owned by the United States within the State. Absent proper acceptance, the United States has no legislative jurisdiction over the property.[3] Instead, it is simply an ordinary proprietor of the property. Paul v. United States, 371 U.S. 245, 264
(1963). Therefore, the federal government lacks the authority to legislate the general criminal law on lands in which the United States holds only a proprietary interest. In such a "proprietary area," the criminal law of the State of Oklahoma governs. This is the type of area referenced in your question.
 II. The Jurisdiction And Authority Of Military Police On Military Bases And Proprietary Areas
¶ 7 That the United States lacks the requisite authority to legislate general criminal law within certain lands which it owns, does not necessarily mean military police cannot enforce state criminal law in those areas. The jurisdiction that military police may exert, however, is subject to the limitations of federal law. The seminal legislative enactment on the subject is the Posse Comitatus Act ("Act"). The Act provides:
Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.
18 U.S.C. § 1385 (2002).
¶ 8 The Act was enacted for the purpose of "limit[ing] `the direct active use of federal troops by civil law enforcement officers' to enforce the laws of this nation." United States v.Hutchings, 127 F.3d 1255, 1257 (10th Cir. 1997) (quotingUnited States v. Red Feather, 392 F. Supp. 916, 922 (D.S.D. 1975)). The prohibitions of the Act are not absolute. The language of the Act provides for exceptions when "expressly authorized by the Constitution or Act of Congress."18 U.S.C. § 1385 (2002). Article I of the United States Constitution grants Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections andrepel Invasions[.]" U.S. Const. art. I, § 8, cl. 15 (1995). However, because this grant of authority may only be realized through Congressional action, nothing is added to the "Act of Congress" exception found in the Act. Save for Section 8, Clause 15 of Article I, the United States Constitution does not contain an express authorization allowing the use of any element of the armed forces to execute civilian law.
¶ 9 Congress has enacted a number of laws permitting the President to call upon the armed forces and the militia to enforce the law in specific circumstances.[4] For instance, federal law authorizes the President to use the armed forces and militia to suppress insurrections against the federal and state governments and when domestic violence obstructs the execution of the laws of a state or the United States. See10 U.S.C. §§ 331-333 (2002).
¶ 10 In addition to the Act, Congress has enacted10 U.S.C. § 375. It provides:
 The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.
Id.
¶ 11 Pursuant to this authority, the United States Secretary of Defense has issued the Department of Defense Directive 5525.5 on the subject of DoD Cooperation with Civilian Law EnforcementOfficials. Enclosure 4, Restrictions on Participation of DoDPersonnel in Civilian Law Enforcement Activities of this Directive, details the restrictions on participation of DoD personnel in civilian law enforcement activities. It provides in part:
 E4.1.2. Permissible direct assistance. The following activities are not restricted by [the Posse Comitatus Act].
 E4.1.2.1. Actions that are taken for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities. This provision must be used with caution, and does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of [the Posse Comitatus Act]. Actions under this provision may include the following,
depending on the nature of the DoD interest and the authority governing the specific action in question:
. . . .
 E4.1.2.1.3. Investigations and other actions related to the commander's inherent authority to maintain law and order on a military installation or facility.
. . . .
 E4.1.2.1.5 Protection of DoD personnel, DoD equipment, and official guests of the Department of Defense.
 E4.1.2.1.6. Such other actions that are undertaken primarily for a military or foreign affair's purpose.
Id. at 14-15 (emphasis added).
¶ 12 The DoD Directive further provides:
 E4.1.3. Restrictions on Direct Assistance. Except as otherwise provided in this enclosure, the prohibition on the use of military personnel "as a posse comitatus or otherwise to execute the laws" prohibits the following forms of direct assistance:
 E4.1.3.1. Interdiction of a vehicle, vessel, aircraft, or other similar activity.
E4.1.3.2. A search or seizure.
 E4.1.3.3. An arrest, apprehension, stop and frisk, or similar activity.
 E4.1.3.4. Use of military personnel for surveillance or pursuit of individuals, or as undercover agents, informants, investigators, or interrogators.
Id. at 17.
¶ 13 The DoD Directive also allows indirect assistance in the form of transferring information acquired in the normal course of military operations, and "other actions . . . that do not subject civilians to use military power that is regulatory, prescriptive, or compulsory." Id. E4.1.7.2, at 20; see id. E4.1.7-E4.1.7.1, at 20.
¶ 14 The principles embodied in the DoD Directive are reflected in cases addressing the use of the armed forces to enforce civilian law. Courts have generally used two different approaches in analyzing alleged violations of the Act and 10 U.S.C. § 375.
Military involvement in civilian law enforcement has been measured against the standard of whether there is an "independent military purpose" for the involvement. For example, in Harker v.State, 663 P.2d 932 (Alaska 1983), the Alaska Supreme Court heard the appeal of a solider who was detained by military police when he fled onto a military installation after committing a state crime off-base. The defendant robbed a convenience store and fled in a vehicle to an Air Force base. His vehicle was identified by an off-duty solider who informed military police. The military police stopped the vehicle, detained the defendant, and then turned him over to civilian authorities. The court ruled military police may turn over on-base detainees to civilian authorities without breaching the Act's limitations. Id. at 937. The court reasoned that the military police had an independent military duty to stop the vehicle, detain the defendant, and turn him over to civilian authorities. Id.
¶ 15 In addition to the "independent military purpose" doctrine, the court relied upon 10 U.S.C. § 814. It provides in pertinent part:
 (a) Under such regulations as the Secretary concerned may prescribe, a member of the armed forces accused of an offense against civil authority may be delivered, upon request, to the civil authority for trial.
Id.
¶ 16 This statute allows military police to transport, to a county jail, members of the armed forces who violate civilian criminal law. It does not grant them the same power, however, over civilians. Therefore, military police may not transport civilians to a county jail pursuant to Section 814.
¶ 17 Similarly, in United States v. Banks, 539 F.2d 14 (9th Cir. 1976) a United States Court of Appeals considered the case of a civilian convicted of possession of heroin who was the subject of a search, seizure, and detention on an Air Force base. On appeal, Banks argued the Act prohibited the military from searching and detaining civilians for a violation of civilian law. Id. at 15. The Ninth Circuit ruled the Act does not prohibit military personnel from detaining civilians for violations of civilian law. Id. at 16. The court said, "The power to maintain order, security, and discipline on a military reservation is necessary to military operations." Id.
¶ 18 Other courts have justified military action when it amounts to no more than indirect assistance. In United States v.Khan, 35 F.3d 426 (9th Cir. 1994), the court adopted a three-part test for determining whether an action constitutes permissible indirect assistance. The court said military involvement is permissible if it (1) does not "constitute the exercise of regulatory, proscriptive, or compulsory military power," (2) does not "amount to direct active involvement in the execution of the laws," and (3) does not "pervade the activities of civilian authorities." Id. at 431 (quoting United States v.Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991). In Khan, a Coast Guard detachment aboard two Navy ships intercepted a ship smuggling hashish while in international waters. The Navy personnel involved did not search the vessel nor did they participate in the arrest. The only involvement the Navy had was to transport the arrestees to Hawaii on behalf of the Coast Guard. The court concluded this sort of "backup support" did not violate the Act because "the military assistance is not direct, not an exercise of military power, and not pervasive of the activities of civilian authorities." Id. at 432.
¶ 19 Similarly, in United States v. Gerena, 649 F. Supp. 1179
(D. Conn. 1986), a federal district court considered a prisoner's challenge to the use of military equipment, facilities, and personnel to transport him and others from a federal courthouse in Puerto Rico to an Air Force base in Puerto Rico so they could be transported to Connecticut for trial. Specifically, Navy helicopters were used to move the prisoners. During the transport, the prisoners were in the custody of United States Marshals. The defendant challenged the use of Navy helicopters as a violation of the Act. Id. at 1181. The court said the dispositive issue in determining the legality of the military involvement was whether "the assistance in question subjected the defendant `to the exercise of military power that is regulatory, proscriptive, or compulsory in nature.'" Id. at 1182. The court concluded that the Navy involvement did not violate the Act.Id. A critical factor relied upon by the court in arriving at this conclusion was the fact that the prisoners remained in the custody of the United States Marshals at all times, and were never subject to the control of the military. Id. The court said, "the military's involvement in the operation is properly characterized as wholly indifferent, passive, and subservient to the Marshals' task." Id.
¶ 20 The Oklahoma Court of Criminal Appeals has adopted an approach to alleged violations of the Act more similar to the "indirect assistance" standard. This issue has arisen in arguments over the admissibility of evidence allegedly obtained in violation of the Act. The court uses a case-by-case review to determine whether "the illegal conduct by the law enforcement personnel rises to an intolerable level as to necessitate an exclusion of the evidence." Taylor v. State, 645 P.2d 522,524 (Okla.Crim. 1982). The critical factor relied upon by the court in making its determinations is whether the military personnel assumed any greater authority than that of a private citizen. Id.; see also Lee v. State, 513 P.2d 125, 126 (Okla. Crim. 1973). In four of the five cases in which the court has ruled on the issue, it determined the military personnel in question did not violate this standard. However, in Taylor the court found a violation of the Act. In Taylor, a military investigator actively participated in an undercover drug purchase, pulled a gun during an arrest, participated in the search of the defendant's home, and delivered the recovered contraband to the Oklahoma State Bureau of Investigation for testing. Id. at 525. The court ruled that the military investigator acted under the authority of his military status and not as a private citizen. Id. Therefore, the court held the evidence inadmissible. Id.
¶ 21 In conclusion, courts have generally used one of two approaches in analyzing alleged violations of the Act. Some courts have permitted the use of the military to enforce civilian law when there is an independent military purpose for involvement. Other courts have allowed military involvement when it does not amount to more than indirect assistance. The Oklahoma Court of Criminal Appeals has found a violation of the Act where military personnel assumed any greater authority than that of a private citizen.
 III. The Transportation Of Civilians By Military Police
¶ 22 You next ask whether military police may transport a person detained for a violation of State law to the county jail. Military police may transport members of the armed forces to county jail pursuant to 10 U.S.C. § 814 (a). However, the same is not true when a civilian is to be transported. Under the "independent military purpose" doctrine and the "indirect assistance" test military police may not transport a civilian to the county jail. The "independent military purpose" doctrine permits the use of the military to enforce civilian law if there is an independent military purpose for the involvement. While there is an independent military purpose for detaining a civilian for violating State criminal law in a proprietary area, there is no independent military purpose in transporting a civilian detainee to a county jail. Rather, the purpose of transporting the detainee is solely for the benefit of civilian law enforcement. Similarly, the transportation of a detainee by military police would fail the "indirect assistance" test. Such action would not meet that standard because it would subject civilians to the exercise of military power that is proscriptive and compulsory in nature, and does not advance a military purpose. Furthermore, it would constitute direct assistance to civilian law enforcement. Therefore, military police may not transport civilians to a county jail without violating the Act.
¶ 23 Applying the standard announced by the Oklahoma Court of Criminal Appeals, the critical factor to be considered in determining whether transportation of a civilian by military police off base to a county jail would violate the Act is the nature of the authority being asserted by the military police. Transportation of a civilian necessarily requires the military police to exert some degree of coercive force. Furthermore, a civilian would be under the sole custody of the military police while being transported. The military police would be acting under the authority of their military status and not as private citizens by transporting a civilian to a county jail. Therefore, the Act prohibits military police from transporting civilians to a county jail.
 IV. The Authority And Jurisdiction Of Sheriffs' Offices On Proprietary Areas
¶ 24 As a general rule, a sheriff's authority to enforce the law is limited to his or her territorial jurisdiction. Stallerv. State, 932 P.2d 1136, 1139 (Okla.Crim. 1996). Once outside that jurisdiction a peace officer, like a sheriff, has no greater authority than that of an ordinary citizen. Id. at 1140. The Oklahoma Court of Criminal Appeals noted several exceptions to this general rule. Peace officers may act outside their jurisdiction when in "hot pursuit; . . . when one municipality has requested the assistance of another municipality's officers;" and when serving "an arrest warrant." Id. at 1139 (footnote omitted). Additionally, the Oklahoma statutes permit sheriffs to enter into mutual aid agreements "to assist or provide law enforcement services to any town, city, and county within this state." 19 O.S. 2001, § 547[19-547] (E). Absent one of these exceptions, sheriffs are limited to the territorial jurisdiction of their counties. If an area of proprietary jurisdiction falls within the territorial jurisdiction of a sheriff's county, then the sheriff has the authority to enforce State law against civilians within that area.
 V. The Duty of Sheriffs to Transport Prisoners
¶ 25 The general powers and duties of the sheriff are set forth at 19 O.S. 2001, §§ 510[19-510] to 565.3. The Oklahoma Legislature states the duties and powers of sheriffs as peace officers at Section 516, which provides:
 It shall be the duty of the sheriff, under-sheriffs and deputies to keep and preserve the peace of their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections, for which purpose and for the service of process in civil and criminal cases, and in apprehending or securing any person for felony or breach of the peace, they and every constable may call to their aid such person or persons of their county as they may deem necessary.
Id.
¶ 26 This general grant of power imposes a duty upon a sheriff to keep and preserve the peace. Upon notification of a potential breach of the peace, the sheriff has a duty to determine whether an arrest is necessary. If the sheriff determines that an arrest is warranted, he or she has a duty to keep the peace by transporting that person to the county jail.
¶ 27 In addition to statutory duties, sheriffs have obligations which arise from the Oklahoma Constitution. In Le Flore CountyExcise Board v. St. Louis-San Francisco Ry. Co., 93 P.2d 1087,1089 (Okla. 1939), the Oklahoma Supreme Court held that "transporting prisoners and insane persons to various institutions of the state" is among the mandatory duties imposed on a sheriff by the Constitution and the Oklahoma Statutes. Id.
In City of Del City v. Fraternal Order of Police, Lodge No.114, 869 P.2d 309 (Okla. 1993), the Supreme Court referencedLe Flore County and said, "We held that the duties of transporting prisoners and serving process imposed upon the sheriff arose out of the Constitution." Id. at 316. Therefore, sheriffs have a constitutional duty to transport prisoners.
¶ 28 The Attorney General has previously opined that the office of sheriff carries all the "common law powers and duties [with it], except as modified by the State Constitutions and by statutes." A.G. Opin. 85-27, 62 (citation omitted). This is because "[t]he common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma[.]" 12 O.S. 2001, § 2[12-2]. In Commentaries on the Lawsof England, Sir William Blackstone recognized the duties of sheriffs at the common law. He observed that "[the sheriff] may, and is bound ex officio to, pursue and take all traitors, murderers, felons, and other misdoers, and commit them to gaol for safe custody." 1 William Blackstone, Commentaries *332. This duty of the sheriff has not been abrogated by the Oklahoma Constitution or the statutes. Therefore, it remains in force. Thus, a sheriff has a duty at common law to transport prisoners.
¶ 29 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. A "proprietary area" is land in which the United StatesGovernment has a possessory interest, yet does not have anydegree of legislative jurisdiction.
 2. A county sheriff maintains the authority to enforce theState's criminal law in a proprietary area. However, militarypolice may detain persons in a proprietary area in order tomaintain security, order and discipline on a military facility.10 U.S.C. § 814(a) (2002).
 3. While military police can transport members of the armedservices who violate criminal law to the county jail, (10 U.S.C. § 814(a)), military police may not transport a civiliandetainee to a county jail without violating the Posse ComitatusAct. 18 U.S.C. § 1385 (2002). Military police may turn overto civilian law enforcement authorities civilians who violateState law in a proprietary area.
 4. A sheriff has a statutory duty to keep and preserve thepeace. 19 O.S. 2001, § 516. Upon notification of a potentialbreach of the peace, the sheriff has a duty to determine whetheran arrest is necessary. Id. A sheriff has a statutory and aconstitutional duty to keep the peace by transporting an arresteeto a county jail. Id.; City of Del City v. Fraternal Order ofPolice, Lodge No. 114, 869 P.2d 309, 316 (Okla. 1993).Additionally, a sheriff has a common law duty to transport anarrestee to the county jail. 1 William Blackstone, Commentaries *332.
W.A. DREW EDMONDSON Attorney General Of Oklahoma
D. CASEY DAVIS Assistant Attorney General
[1] "Partial jurisdiction" has been interpreted to include concurrent jurisdiction. Adams v. United States, 319 U.S. 312
(syllabus ¶ 2) (1943). Concurrent jurisdiction is the "[a]uthority shared by two or more legislative, judicial, or administrative officers or bodies to deal with the same subject matter." Black's Law Dictionary 264 (5th ed. 1979).
[2] Title 40 U.S.C. § 255 was amended in 1940. See Act of Oct. 9, 1940, ch. 793, 54 Stat. 1083. Prior to the Act, it was presumed that the United States accepted any jurisdiction ceded to it by the states. Fort Leavenworth R.R., Co. v. Lowe,114 U.S. 525, 533 (1885).
[3] Whether the United States has properly accepted jurisdiction is a question of fact and, therefore, is not the proper subject of an Attorney General's Opinion. 74 O.S. 2001, §18b[74-18b] (A)(5).
[4] For an exhaustive list, see U.S. Dep't of Defense, Dir. No. 5525.5, DoD Cooperation with Civilian Law Enforcement Officials 16-17 (E4.1.2.5-E4.1.2.5.14) (1989) [hereinafter DoD Dir.].