896 P.2d 911

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Michael PATTIOAY, Jay Rodrigues, Rosaline Rodrigues, and Dwayne D. Gould, also known as "Kimo," Defendants–Appellees.**

**No. 17393.**

Supreme Court of Hawai'i.

May 16, 1995.

Donn Fudo, Deputy Pros. Atty., Honolulu, for plaintiff-appellant.

Theodore Y.H. Chinn, Deputy Public Defender, Honolulu, for defendant-appellee Michael Pattioay.

Ray Allen Findlay, Honolulu, for defendant-appellee Rosaline Rodrigues.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

On October 31, 1991, Michael Pattioay, Jay Rodrigues (Jay R.), Rosaline Rodrigues (Rodrigues), and Dwayne Gould (collectively Defendants–Appellees) were charged with Promoting a Dangerous Drug in the Second Degree (Counts I–VII), in violation of Hawai'i Revised Statutes (HRS) § 712–1242(1)(c) (Supp.1992), Promoting a Dangerous Drug in the First Degree (Count VIII), in violation of HRS § 712–1242(1)(B)(ii) (Supp.1992), Promoting a Dangerous Drug in the Third Degree (Count IX), in violation of HRS § 712–1243 (Supp.1992), and Unlawful Use of Drug Paraphernalia (Count X), in violation of HRS § 329–43.5(a) (Supp.1992). Rodrigues was also charged in another criminal action with Promoting a Dangerous Drug in the Second Degree, HRS § 712–1242(1)(c) (Additional Count). The circuit court consolidated both actions and issued an order (Order) granting in part Rodrigues' motion to suppress, in which the other Defendants–Appellees had joined.

The prosecution filed a timely notice of appeal on September 1, 1993, arguing that the court committed reversible error in granting the motion to suppress by basing its decision on erroneous findings of fact and conclusions of law. For the reasons set forth below, we affirm.

## I. BACKGROUND

At the hearing on their motion to suppress, the Defendants–Appellees called David Foster as a witness. Foster is a military police officer attached to the U.S. Army Criminal Investigation Department (Army CID). Foster testified that he was assigned as an undercover agent to a joint operation between the Army CID and the Wahiawa Crime Reduction Unit of the Honolulu Police Department (HPD). The Army CID had been involved previously in joint operations

with the HPD using undercover operations to target suspected civilian drug dealers.

Foster further testified that he was given guidelines for "targeting" civilians in military investigations, which specify as follows: where a soldier, military dependant or Department of Defense (DOD) civilian has stated that drugs had been purchased from civilians, a sufficient military connection exists to justify controlled "off post" drug purchases, including surveillance of alleged civilian drug suppliers. Before taking such action, a form had to be prepared and forwarded to military headquarters for authorization. Once authorization was received, the Army CID called the HPD Crime Reduction Unit and planned an undercover operation targeting the civilians suspected of selling drugs to military personnel.

Foster estimated that over fifty percent of the undercover activities performed by the Army CID during his tenure were directed against civilian targets. Foster also testified that he personally worked as an undercover agent in more than twenty-five but less than fifty cases where civilians were targeted. According to Foster, whenever a targeted civilian was "off post," HPD was always involved.

The Army CID initiated the investigation in the instant case when the military obtained information about the purchase of drugs from the Defendants–Appellees by Tanya Slaten, a military dependent who was under investigation by the military police. Another Army CID agent subsequently "turned" Slaten into an informant sometime in February 1989. Foster participated in briefing sessions at Schofield Barracks on April 13, 1989 concerning a controlled drug purchase to be made that day at the Defendants–Appellees' civilian residence in Wahiawa. HPD Officer George Clark was also present at these briefings.

Following the briefing, Foster and Slaten drove to the Wahiawa house where he and Slaten were invited inside. Foster was specifically asked to present identification. Rodrigues was present, but Foster purchased two packets of cocaine from Gould. The packets were later submitted to Foster's

superiors and field tested by military personnel before being turned over to Clark.

On April 19, 1989, Foster (accompanied by a surveillance team made up of two other Army CID agents and Clark) returned to the Wahiawa house and purchased two more packets of cocaine from Pattioay. Before purchasing the cocaine, Foster showed Pattioay his military identification card as Pattioay had instructed.

On May 10, 1989, Foster went to the Wahiawa house once again, and Gould sold him two more packets of cocaine. After this purchase, Foster submitted the drugs to Clark. Then, on May 31, 1989, Foster bought two additional packets of cocaine from Rodrigues. On June 28, 1989, Foster attempted to make another purchase at the Wahiawa home but learned that the Defendants–Appellees had moved to another location. At this new location, Foster again purchased drugs from Rodrigues and Gould. As in all previous buys, Foster was armed and the surveillance team provided protection for him. The drugs were once again submitted to Clark's custody.

Finally, Rodrigues sold Foster cocaine on August 15, 1990 under similar conditions. At this sale, however, the surveillance team was made up of three Army CID agents plus three HPD officers, including Clark. Sometime after this sale, HPD searched the house and arrested the Defendants–Appellees. Foster testified that he believed the search warrant prepared for the house from which the Defendants–Appellees sold the cocaine was based in part on the transaction of August 15, 1990. Military personnel neither prepared nor executed the search warrant nor participated in the arrests.

Clark testified that he has participated in over one hundred joint investigations with the Schofield Drug Suppression Team. In all these investigations, the military would initiate the cases on post and, if civilians were involved, contact HPD for "jurisdictional reasons." Clark's assignment was to "initiate cases, document them, ... and assist [the Army CID] in narcotics investigations" by providing back-up and surveillance. He would also obtain physical evidence from the undercover Army CID personnel and place

the evidence with HPD for storage and subsequent civilian criminal prosecution. The Army CID did not assist Clark in completing the case; this was Clark's responsibility. Army CID neither assisted in the arrest nor the search of the Defendants–Appellees' residence.

Over the objections of Rodrigues's attorney, the circuit court allowed Army CID Special Agent Scott May to testify as to the general procedure followed in submitting requests to Army headquarters in Korea for its approval of off-post investigations by Army CID. Although May had no personal knowledge of this case, other than what he had read, the prosecution sought to introduce into evidence two Army CID documents concerning a request and approval for this joint civilian-military investigation. Despite continuous objections by counsel for one of the Defendants–Appellees,[1] the court allowed May to testify concerning the two proffered documents, "as an example of what happens."

May testified that, in general, after receiving information about civilians selling significant amounts of drugs to military members, a request is sent to regional headquarters in Korea requesting authorization to proceed with an investigation. When the prosecution attempted to connect May's testimony to the proffered documents, the court sustained defense counsel's hearsay objections, but eventually overruled an objection based on a lack of foundation with respect to May's personal knowledge of the relevant events. Consequently, May testified that the request and approval procedure was followed in the instant case. The court then admitted the proffered evidence, but only "as proof of the operative facts, that ... requests were made for approval and approval was received ... to initiate the investigation or the undercover operation.... Whether or not the facts underlying approval were correct or not is not at issue."[2] Defense counsel promptly reasserted the HRE Rule 106 objection, *see supra* note 1, arguing that approval was not properly granted under the appropriate military regulations, and suggesting that this could be shown through documents not included in the prosecution's incomplete proffer of evidence. Nevertheless, the court overruled the objection, stating that counsel could either: (1) submit a written motion for reconsideration identifying the additional documentation required; or (2) elicit the necessary information under cross-examination.

On cross-examination, May acknowledged that the documentary evidence allegedly showing "approval" by military command was not actual approval. He stated that "[t]he approval comes by voice" and that he did not have any personal knowledge that such approval was in fact given, only that the file indicated approval was provided in compliance with military regulations. *See* 32 C.F.R. §§ 213(a)(2) and (3). Defense counsel then made renewed objections to the prosecution's evidence and also moved to strike Foster's testimony concerning the approval process. The court denied the motion and indicated that it would take the matter under advisement.

After oral arguments, the court obviated a review of its preliminary evidentiary rulings by filing an order suppressing all evidence obtained by the military relating to the Additional Count,[3] and Counts IV through X.[4]

1. Counsel asserted that the proffered documents were inadmissible hearsay under Hawai'i Rules of Evidence (HRE) Rule 803, *see* A. Bowman, *Hawai'i Rules of Evidence Manual* 346 (1990), and further challenged their authenticity, relevance, intelligibility, and completeness under HRE Rule 106. Because the circuit court ultimately suppressed the evidence, the court's preliminary evidentiary rulings are not at issue on appeal.

2. In other words, the prosecution did not establish a nexus between the Defendants–Appellees and any military personnel, as a matter of fact, based on the information Slaten allegedly provided to the Army CID. Nor did the prosecution establish that the Defendants–Appellees supplied drugs that entered the base. In fact, the prosecution failed to produce the Army CID agent who allegedly obtained the information from Ms. Slaten.

3. The evidence upon which this charge is based was obtained on August 15, 1990.

4. The remaining counts (I–III) involved controlled purchases of drugs by Clark and Cardenas on November 2 (from Pattioay), November 16 (Pattioay, Jay R., and Rodrigues), and December 19, 1988 (Rodrigues). These undercover operations were independent of the joint operation with the Army CID.

Although no member of the military was involved in the search that led to the recovery of evidence at issue in Counts IX and X, the evidence was nonetheless suppressed because the search was performed pursuant to warrants based in part on the transactions in Counts IV through VIII:

> The transactions in Counts IV through VIII ... and the buy [resulting in the Additional Count] ... clearly involved the direct assistance "... of military personnel for surveillance ... or as undercover agents ..." in direct contravention of 32 C.F.R. § 213.10(a)(3)(iv)....

> Admittedly, the interdiction of drug trafficking is in the military interest, as it is in the civilian interest. Yet there is nothing here which indicates that this military operation was "taken for the *primary* purpose of furthering a military ... function *of the United States.*" 32 C.F.R. § 213.10(a)(2)(i).... No military function was involved here. Rather, what was involved here were off-post sales by civilians only, a matter clearly within the scope of civilian law enforcement responsibility. Indeed, as indicated at the hearing, HPD had already made three separate buys through its own police undercover agent from the Rodrigues' home prior to the military operation (see Counts I through III ...).

> Further buttressing this finding of a violation under 32 C.F.R. § 213 is House Report No. 97–71 [sic] on 10 U.S.C. 375 which states that "[t]he Committee adopted the view of the Department of Justice that the weight of authority on [sic] the Posse Comitatus Act 'prohibits the use of military personnel as informants, undercover agents, or non-custodial interrogators in a civilian criminal investigation that does not involve potential military defendants or is not intended to lead to any

official action by the armed forces.' [Citation omitted.]"

> 32 C.F.R. § 213.10(a)(3) was written in aid of the enforcement of the Posse Comitatus Act.... Here, the repeated instances of the military involvement as evidenced above were largely independent and pervasive.... The military control and involvement was clearly pervasive and largely unregulated by civilian law enforcement officials based on evidence presented at the hearings herein.... In view of the foregoing, the need to deter the pattern of conduct hereinabove described is clear. Under the particular circumstances of this case, suppression is warranted.

Order at 5–7 (emphasis in original).

## II. *STANDARDS OF REVIEW*

 A circuit court's findings of fact (FOF) are reviewed under the clearly erroneous standard. *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citing *State v. Hutch,* 75 Haw. 307, 328, 861 P.2d 11, 22 (1993)). "An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been made." *Id.* The circuit court's conclusions of law are reviewed under the right/wrong standard. *Id.* at 180, 873 P.2d at 59 (citing *In re Estate of Holt,* 75 Haw. 224, 234, 857 P.2d 1355, *reconsideration denied,* 75 Haw. 580, 863 P.2d 989 (1993)).

## III. *DISCUSSION*

The prosecution argues that ferreting out persons who supply illegal drugs to military personnel is a "primary purpose" of the military; therefore, suppression was not appropriate. The Defendants–Appellees counter that the circuit court's interpretation of the Posse Comitatus Act and related military regulations was correct. *See* 18 United States Code (U.S.C.) § 1385 (1988).[5]

---

**5.** The Posse Comitatus Act provides in pertinent part:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be

fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385. "The phrase 'posse comitatus' is literally translated from Latin as the 'power of the county' and is defined at common law to refer to all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Hartley,*

### A. *The Posse Comitatus Act*

The Posse Comitatus Act (PCA) was passed shortly after the end of the Reconstruction Era and was designed to "put an end to the use of federal troops to police state election[s] in the ex-Confederate state[s] where the civil power had been reestablished." *Chandler v. United States,* 171 F.2d 921, 936 (1st Cir.1949), *cert. denied,* 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081, *rehearing denied,* 336 U.S. 947, 69 S.Ct. 809, 93 L.Ed. 1103 (1949). In 1981, Congress enacted certain measures to clarify the permissible nature of military cooperation with civilian law enforcement agencies under the PCA. For example, 10 U.S.C. § 375 (1988) provides:

Restriction on direct participation by military personnel.

The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter *does not include or permit direct participation* by a member of the Army, Navy, Air Force, or Marine Corps *in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.*

(Emphasis added.) A House of Representatives Committee report accompanying this legislation anticipated, nonetheless, that "an increased sensitivity to the needs of civilian law enforcement officials, *particularly in drug enforcement,* will permit more compatible mission planning and execution." *United States v. Hartley,* 796 F.2d 112, 115 n. 6 (5th

Cir.1986) (citing H.Rep. No. 71, 97th Cong., 1st Sess. 1, 8 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 1781, 1791 n. 1) (emphasis added).[6] Accordingly, the use of military equipment, and the reporting of information received incidentally to normal operations (e.g., training exercises), is clearly permitted by law. *See* 10 U.S.C. § 374 (1988). Nevertheless, direct involvement of military personnel in civilian law enforcement is generally prohibited. *See* 10 U.S.C. § 375, *supra.*

In compliance with 10 U.S.C. § 375, the Secretary of Defense promulgated a directive in April 1982, entitled "DOD Cooperation With Civilian Law Enforcement Officials." *See* 32 C.F.R. § 213.10(a)(3)(iv) (1989). This directive includes a prohibition on the "[u]se of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators or interrogators." *Id.; see also* H.R.Rep. No. 71, 97th Cong., 1st Sess. 1, 8 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 1781, 1791 n. 1. However, "depending upon the nature of the DOD interest and the specific action in question," the following purposes are permissible: "[a]ctions related to enforcement of the Uniform Code of Military Justice (10 U.S.C. Chapter 47)," and "such other actions that are undertaken primarily for a military ... purpose." 32 C.F.R. § 213.10(a)(2)(i)(A) & (F).[7] Hortatory language contained in this subsection nevertheless provides that the "primary military purpose" exception "must be used with caution, and does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid

---

796 F.2d 112, 114 n. 3 (5th Cir.1986) (citation omitted).

**6.** However, the same legislative report also indicates that although the proposed section (10 U.S.C. § 375) "authorizes the assignment of military personnel to operate and maintain equipment made available under section 372 of this Chapter[, i]n light of the historical and policy considerations behind the Posse Comitatus Act, *this section is to be construed narrowly.*" Hse. Rep. No. 71, 97th Cong., 1st Sess. 1, 12, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1781, 1794. In addition, the Committee noted that: [t]he rejection of [an] amendment [suggesting that the assistance permitted by § 375 should

be made available only outside the United States] should not be viewed as an encouragement of such military assistance within the United States. Rather, the Committee expects that the vast majority of requests for assistance will be for operations that occur outside the geographic United States.
*Id.* at 12, 1981 U.S.Code Cong. & Admin.News at 1795.

**7.** Part 213 was removed from the Code of Federal Regulations in 1993. 58 Fed.Reg. 25776 (Apr. 28, 1993) ("These parts have served the purposes for which they were intended and are no longer valid").

the restrictions of the Posse Comitatus Act." 32 C.F.R. § 213.10(a)(2)(i).

■ In addition, the DOD has issued a policy memorandum that allows military assistance in civilian law enforcement only when the following specific guidelines are met:

(1) If there are reasonable grounds to believe that [a person not subject to the U.C.M.J.] has committed a drug offense in conjunction with a member of the Armed Forces *and the investigative actions are undertaken to obtain evidence concerning all illegal drug transactions between such person and any member of the Armed Forces,* or

(2) If there are reasonable grounds to believe that such person is the immediate source of the introduction of illegal drugs onto the military installation *and the investigative actions are undertaken to obtain evidence concerning all persons engaged in drug trafficking on the installation.*

*See Moon v. State,* 785 P.2d 45, 46–47 (Alaska Ct.App.1990) (emphasis added), *affirmed, Kim v. State,* 817 P.2d 467 (Alaska 1991). In other words, incidental enhancement of civilian law enforcement is permissible in limited circumstances. "[W]here there is an independent military purpose of preventing illicit drug transactions to support the military involvement, the coordination of military police efforts with those of civilian law enforcement officials does not violate" the PCA. *Hayes v. Hawes,* 921 F.2d 100, 103 (7th Cir.1990).[8]

Congress was evidently aware of "calls for the military to be directly involved in search, seizure, and arrests" but did not think it "appropriate to make such a radical break with the historic separation between military and civilian functions[.]" Hse.Conf.Rpt. No. 989, 100th Cong., 2d Sess., at 452 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2503, 2580. The conferees addressed this issue further by writing the following:

The demand by some for use of the military in drug-related arrests would quickly fade in the face of actual law enforcement confrontations between the uniformed military and American civilians. As former Chief Justice Burger has noted, the American experience has been marked by "a traditional and strong resistance ... to any military intrusion into civilian affairs. That tradition has deep roots in our history...." *Laird v. Tatum,* 408 U.S.C. [U.S.] 1, 15 [92 S.Ct. 2318, 2327, 33 L.Ed.2d 154] (1972). The Posse Comitatus Act, as one court has noted, is not 'an anachronistic relic of an historical period the experience of which is irrelevant to the present. It expresses the inherited antipathy of the American to the use of troops for civil purposes.... Its relevance to this age is sadly clear.' *Wrynn v. United States,* 200 F.Supp. 457, 465 (E.D.N.Y. 1961).

In testimony before the Senate Armed Service Committee, Secretary of Defense Carlucci noted: "... I am even more firmly opposed to any relaxation of the posse comitatus restrictions on the use of the military to search, seize, and arrest.... The historical tradition which separates military and civilian authority in this country has served both to protect the civil liberties of our citizens and to keep our Armed Forces militarily focused and at a high state of readiness."

*Id.* at 453, 1988 U.S.Code & Cong.Admin.News at 2581–82.

The following year, Congress heralded the success of coordinated military/civilian drug-interdiction efforts, but clearly expressed its commitment to retaining restrictions on more direct military involvement with civilian law enforcement:

The [National] Guard program of assisting Customs in the inspection of cargo at land, sea and air ports of entry—a resounding success with no adverse public reaction—should be extended to active duty and reserve forces as well. The Army has supported U.S. and Bahamian efforts in the Bahamas by using Blackhawk helicopters

---

**8.** *See also United States v. Roberts,* 779 F.2d 565 (9th Cir.1986) (involving the use of a U.S. Navy *ship* in joint drug interdiction efforts off the Mexican Coast with the U.S. Coast Guard); *Unit-* ed *States v. Hartley,* 796 F.2d 112 (5th Cir.1986) (involving the use of Air Force *equipment* to track aircraft suspected of illegal transportation of marijuana).

to chase smugglers and transport arresting officers. This program can be expanded *without directly involving military personnel in law enforcement confrontations with citizens.*

Hse.Rep. No. 121, 101st Cong., 1st Sess., at 320 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 838, 941 (emphasis added).

## B. *Examining the Purpose of Military Involvement in the Instant Case*

In an effort to advance its argument that the primary purpose of the joint civilian-military investigation in the instant case was to further valid military interests, the prosecution contends that many of the circuit court's FOF are clearly erroneous. With the exception of its claims regarding FOF 9 and 15, the prosecution merely asserts that the court "fail[ed] to recite" certain facts about the incidents at issue in this case. However, the alleged omissions in FOF 3, 7, 8, 10, 12 and 16 merely reflect elements that the pros-

ecution either failed to present at the suppression hearing, or that are insignificant to the court's ruling.[9] In other words, the prosecution did not produce sufficient evidence to support its contention that the military's investigation of the Defendants–Appellees was for a valid military purpose. Army CID Agent May's otherwise pertinent testimony was only admitted "as an example of what happens." *See supra* at 457–458, 896 P.2d at 913–914.[10]

Concerning FOF 9,[11] the prosecution argues that this finding represents a "material misstatement of fact ... inasmuch as it leaves the impression Defendants[–Appellees] were subjected to an overbearing and unlawful military presence which was clearly not the case." However, the record expressly supports FOF 9, the prosecution's criticism notwithstanding.

The prosecution makes a similar claim with respect to FOF 15,[12] asserting that the cir-

---

9. The prosecution claims that the FOF (1) do not indicate that the military investigation was prompted by information that the Defendants–Appellees were dealing drugs to military personnel who brought the contraband back to military installations and (2) fail to indicate the absence of military force or any actual involvement in the search or arrest of Defendants–Appellees.

10. Absent more specific evidence concerning a particular joint military-civilian investigation, the Army CID approval request and authorization documents do not support the prosecution's assertion of a primary military purpose. One relevant section reveals that the "JUSTIFICATION FOR MILITARY INVOLVEMENT" was not investigation of possible military connections, but because the local authorities sought:

> CID ASSISTANCE TO ATTEMPT TO *INTRODUCE AN HPD COVERT AGENT* ONCE THE SUBJECTS GAIN THE ASSISTANCE OF A DRUG SUPPRESSION TEAM (DST) MEMBER (WHO APPEARS AS A SOLDIER), *DUE TO THE FACT THAT HPD DETECTIVES CANNOT IMPERSONATE A SOLDIER EFFECTIVELY* IN THE ['OHAI] STREET AND OLIVE STREET AREA OF WAHIAWA, HI. THIS IS THE MAIN DRUG TRAFFICKING AREA WITHIN WAHIAWA, AND MOST OF THE HPD DETECTIVES ARE KNOWN TO THESE TRAFFICKERS. THESE TRAFFICKERS PREFER TO DEAL WITH SOLDIERS ASSIGNED TO SCHOFIELD BARRACKS, HI, AS THEY ARE UNLIKELY POLICE.

This is not necessarily an improper purpose by itself, but helps to rebut the suggestion that a valid military purpose prompted the investiga-

tion. Furthermore, the Army CID "INVESTIGATIVE PLAN" indicates that:

> B. ... *THE CITY AND COUNTY OF HONOLULU PROSECUTOR'S OFFICE REQUIRES MULTIPLE PURCHASES TO SUCCESSFULLY PROSECUTE THE CASE.* IF DEEMED NECESSARY, THE DST MEMBER WILL COMPLETE ADDITIONAL PURCHASES, AS *THE CITY AND COUNTY OF HONOLULU PROSECUTOR'S OFFICE WILL NOT ACCEPT CASES FOR PROSECUTION THAT HAVE INFORMANTS INVOLVED IN PURCHASES,* DUE TO PROBLEMS THEY HAVE EXPERIENCED IN LOCATED [sic] [Army CID] INFORMANTS AND RETURNING THEM TO [HAWAI'I] TO TESTIFY AS WITNESSES IN TRIALS.

Reference to an arguable military purpose appears to be an afterthought: "G. EVALUATE ANY INFORMATION PROVIDED BY THE SUBJECT AND/OR THE RESULTS OF THE SEARCH WARRANT [executed by HPD], AND DETERMINE IF FURTHER MILITARY INVESTIGATIVE ACTIVITY IS NEEDED."

11. The court, in FOF 9, states that "Fosters' [sic] *surveillance and backup teams* for most of the above transactions consisted of three active duty military members and one Honolulu Police Department ("HPD") officer. The August 15, 1990, buy [resulting in the Additional Count] involved four military and three HPD officers." (Emphasis added.)

12. FOF 15 states that "[t]he operation targeted activity involving violations of criminal laws and did not involve the Uniform Code of Military Justice."

cuit court's finding is clearly erroneous because "[p]ossession and distribution of cocaine are violations of the Uniform Code of Military Justice[.]" Be that as it may, "[a]ll of the persons 'targeted' by the aforesaid undercover DST operation involved herein were *civilians; no military personnel were involved as 'targets' of the investigation.*" FOF 12 (emphasis added). The military does not have jurisdiction over civilians in peacetime. *See* Schleuter, *Military Criminal Justice* 152 (3rd Ed.1992). Furthermore, article I, section 16 of the Hawai'i State Constitution (State Constitution) provides that "[t]he military shall be held in strict subordination to the civil power." *See also Duncan v. Kahanamoku,* 327 U.S. 304, 325, 66 S.Ct. 606, 616, 90 L.Ed. 688 (1945) (Murphy, J., concurring).[13]

There is substantial evidence in the record to support the finding in FOF 12 that the undercover operation conducted by military investigators only targeted civilians. Furthermore, the record does not reflect any attempt to connect the sale of drugs by the Defendants–Appellees to any military personnel other than the controlled sale to Army CID agent Foster; nor is there any evidence that the Army CID made any attempt to follow drug trafficking between the Defendants–Appellees and the base. Prior to the controlled purchases in the instant case, the only suggestion of an on-base connection was the claim by the Army CID's informer, Tanya Slaten, a military dependent.[14] *See supra* note 2 (indicating that the prosecution failed to establish a sufficient connection between

the Defendants–Appellees and any military personnel or installation). The only evidence arguably suggesting a primary military purpose is the affidavit of an Army CID operations officer that contains the bare, unsupported assertion that "[a]t all times, [the Army CID]'s primary purpose in participating in joint off-post drug investigations is to investigate the distribution of illicit drugs to soldiers and to halt the introduction of those drugs onto military installations." *But see supra* note 10. In light of the record as a whole, we are not convinced that any of the challenged circuit court findings are clearly erroneous.

The prosecution nevertheless argues that *State v. Hayes,* 102 N.C.App. 777, 404 S.E.2d 12 (1991), which validated the incidental enhancement of local law enforcement efforts by military investigators, should persuade us to validate the Army CID's involvement in this case. In *Hayes,* an AWOL soldier under investigation for drug-trafficking told an undercover Army CID agent that he could acquire cocaine from a person he knew in the military, presumably at a residence located off-base. The agent contacted local law enforcement and went with the AWOL soldier to the residence in an attempt to purchase drugs from the suspected military dealer. At the apartment, Hayes identified himself as a member of the military and, in conjunction with two other individuals, sold several ounces of cocaine to the undercover Army CID agent. Unaware that the agent had set up a controlled buy, the AWOL soldier

**13.** As observed by a local commentator, it is illegal to:
> [use the] military forces of the United States to enforce the civil laws of the State of [Hawai'i].... Hence a clearly defined national policy militates against the use of fruits of a violation of the [PCA] as evidence.... [T]he experience of the people of [Hawai'i] in the not too distant past buttresses the deep-seated commitment to the supremacy of the civil power against the use of evidence obtained by the use of military personnel.

Christensen, "Suppression of Evidence Without the Aid of the Fourth, Fifth and Sixth Amendments," 8 Hawai'i B.J. 109, 112 (1972). Christensen may have been referring to the imposition of martial law in the islands on December 7, 1941 and lasting through October 24, 1944. *See* J. Garner Anthony, *Hawai'i Under Army Rule* (1955). Another example from Hawaiian history

is the January 17, 1895 military trial of the kingdom's last monarch, Queen Lili'uokalani, notwithstanding the facts that (1) she was charged with an offense triable in the civilian courts, and (2) the civil courts were still functioning at the time.

**14.** Slaten was subsequently jailed in West Virginia, presumably for unrelated offenses. The prosecution apparently did not intend to produce Slaten as a witness. The Defendants–Appellees obtained a court order requiring the prosecution to produce her, but Defendant–Appellee Gould's court-appointed counsel developed an ear infection that prevented him from taking part in the proceedings. The case was then continued, and Slaten returned to West Virginia without testifying.

bagged the drugs, carried them out, and was subsequently arrested by local law enforcement. The Army CID agent later identified the other participants in the transaction. The North Carolina Court of Appeals subsequently held that the military assistance did not violate the PCA. *Id.* 404 S.E.2d at 15. *Hayes* is clearly distinguishable from the instant case because the target of the investigation was a member of the military. *See also United States v. Thompson*, 30 M.J. 570 (A.F.C.M.R.1990), *affirmed*, 33 M.J. 218 (C.M.A.1991) (involving a joint civilian/military investigation of a member of the Air Force).

The Alaska Court of Appeals also upheld the incidental enhancement of civilian law enforcement efforts by military investigators in *Moon, supra.* In *Moon*, a lieutenant in the Anchorage Police Department (APD) sought the assistance of the Army CID for a narcotics investigation because the local dealers seemed to target military personnel. 785 P.2d at 46. Before the military authorities actually entered into a joint investigation with the APD, they obtained independent verification of illicit drug activity involving military personnel. Specifically, members of the Army's drug suppression team observed other soldiers buying drugs in the vicinity of the area under investigation and saw vehicles with Fort Richardson registration stickers parked nearby. *Id.* "The [joint] investigation was not begun until the military was satisfied that drug dealers at the Palace Hotel had targeted military personnel as a market. It was also reasonable to infer that a substantial quantity of illicit drugs was finding its way onto the base." *Id.* at 48 (citing *Harker v. State*, 663 P.2d 932, 936 (Alaska 1983)). Unlike the instant case, a sufficient military connection was clearly established in *Moon. See also Hawes*, 921 F.2d at 103 (involving drug purchase by Naval Investigative

Services agent across the street from a naval base, after a sailor who was found in possession of cocaine apparently identified that location as the place of purchase; court stated that agent's "activities were much like those of an undercover civilian cooperating with the police in a controlled drug transaction").

The prosecution claims that the Army CID possessed "information identifying Defendants[–Appellees] as traffickers in significant amounts of drugs to military personnel who brought the drugs back to the installation." The prosecution also makes the unsupported assertion that Ms. Slaten's information was "reliable." [15] However, the admissible evidentiary facts of this case reveal that the prosecution merely showed that the Army CID requested and received approval to initiate the investigation. Army CID agent May's testimony and the prosecution's Exhibits were not admitted to prove the truth of the underlying facts presented to the Army CID's command. *See supra* note 2. Given the state of the record, the prosecution has not shown that the military had reasonable grounds to believe that military personnel had violated the U.C.M.J. when the investigation was authorized. *Cf. State v. Sherlock*, 70 Haw. 271, 768 P.2d 1290 (1989) (reversing lower court's order suppressing evidence obtained under a search warrant after inquiring into the informant's reliability and noting that the police corroborated the information given by the unnamed informant before requesting the search warrant).[16]

Where the target of a military investigation is a civilian and there is no verified connection to military personnel, the PCA prohibits military participation in activities designed to execute civilian laws. *People v. Tyler* (*Tyler I*), 854 P.2d 1366 (Colo.App. 1993), *rev'd on other grounds*, 874 P.2d 1037 (Colo.1994) (*Tyler II*).[17] *Cf. State v. Prop-*

---

**15.** Although other informants for the Army CID were at times either paid or provided with bonuses for their information, Ms. Slaten was not compensated.

**16.** The prosecution's reliance upon approval by the military command, without having established that the Army CID had reasonable grounds to conduct the investigation, is analogous to a request that the courts rely on the issuance of a search warrant to justify the validi-

ty of the subsequent search and seizure without considering the circumstances under which the warrant was issued.

**17.** In *Tyler II*, the Colorado Supreme Court reversed the judgment of the court of appeals and directed that court to reinstate the judgment of conviction entered against Tyler in the trial court on unrelated grounds.

*ios,* 76 Hawai'i 474, 879 P.2d 1057 (1994) (affirming a circuit court order suppressing evidence obtained in a probationary search that was conducted for the subjectively improper purpose of criminal prosecution). In fact, the apparent justification for the military involvement in the instant case was to facilitate the enforcement of civilian laws. *See supra* note 10. In *Tyler I,* the Colorado Court of Appeals stated:

> *before* the military may directly participate in an undercover investigation of these civilians and their off-base activities, the state carries the burden of demonstrating that there exists a *nexus between drug sales off base by civilians to military personnel and the military base at which the purchasers are stationed. See Moon v. State, supra.* Hence, the prosecution has a duty to present evidence to show that, when a military investigation was undertaken, the targeted drug transactions involved military personnel or were connected to sales conducted on a military installation.

854 P.2d at 1369 (emphases added and citations omitted); *see also Moon,* 785 P.2d at 46–47 (citing two conditions that must be met in order for the military to investigate persons not subject to the U.C.M.J.).[18]

Furthermore, we agree with the observation in Chief Justice Rabinowitz's dissent in *Kim v. State, supra;* he observed that an independent military interest in the health and safety of its personnel does not establish a "military function" or "primary [military] purpose" under 32 C.F.R. § 213.10(a)(2)(i). 817 P.2d at 471 & 471 n. 10. That the military has a valid interest in ferreting out those who supply drugs to military personnel,[19] does not automatically qualify its aid to civilian drug law enforcement as having the "primary purpose of furthering a military ... function[.]" *Id.; cf. Propios, supra. Accord, Taylor v. State,* 645 P.2d 522, 525 (Okla. Crim.1982) (involving a military police officer who violated the PCA by actively participating in an undercover drug operation, arrest, and search—including the act of drawing his gun during the arrest, participating in a subsequent search, and processing the evidence seized therein).[20]

Although the Army CID apparently received authorization from military command to initiate an undercover investigation of civilians and their off-base activities, this fact alone cannot justify the military's participation in the instant case. *Cf. Tyler I,* 854 P.2d at 1370 (noting that the prosecution failed to present *any* evidence purporting to establish the necessary nexus to military personnel or on-base effects). The approval request and authorization documents themselves suggest a primary purpose of facilitating civilian law enforcement, *see supra* note 10; consequently, the stated military purpose in the instant case is merely incidental to an improper objective.[21]

---

**18.** In addition to being based on reasonable grounds to believe that a civilian has sold drugs to a person subject to the U.C.M.J., or is the source of drugs introduced onto a military installation, joint civilian-military investigations must be undertaken to obtain evidence concerning: "(1) ... all illegal drug transactions between such person and any member of the Armed Forces," or "(2) ... all persons engaged in drug trafficking on the installation." The prosecution fails to address either of the latter requirements other than to refer to the unverified information—i.e., that Slaten, a military dependent, bought drugs from one of the Defendants–Appellees—allegedly obtained from Slaten by an Army CID agent who did not testify at the suppression hearing.

**19.** *See Moon,* 785 P.2d at 48; *Harker,* 663 P.2d at 936; *Hartley,* 796 F.2d at 112; *Hawes,* 921 F.2d at 101; *Wright v. State,* 749 S.W.2d 935, 936–37 (Tex.App.1988); *see also, Burkhart v. State,* 727 P.2d 971, 972 (Okla.Crim.1986) (citing with approval *State v. Trueblood,* 46 N.C.App. 541, 265 S.E.2d 662, 664 (1980)); *Lee v. State,* 513 P.2d 125, 126 (Okla.Crim.), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1973); *Burns v. State,* 473 S.W.2d 19, 21 (Tex.Crim.App.1971); *State v. Maxwell,* 174 W.Va. 632, 328 S.E.2d 506, 509 (1985).

**20.** If not for this clearly illegal conduct in *Taylor,* the investigation apparently would not have violated the PCA under our analysis because the Army CID officer "was investigating two enlisted men's participation in drug trafficking ... [and] his investigation led to an off-base source." *Id.* at 523.

**21.** We decline to adopt a mandatory requirement that PCA violations be based on a finding that the military's exercise of authority in an individual case was "pervasive." *See, e.g., United States v. Bacon,* 851 F.2d 1312, 1313 (11th Cir.1988); *United States v. Casper,* 541 F.2d 1275, 1278 (8th

At the hearing on Defendants–Appellees' motion to suppress for alleged violation of the PCA, the burden of proof by a preponderance of the evidence was on the Defendants–Appellees to support the claim that a joint civilian-military investigation violated the PCA. *See State v. Scanlan,* 65 Haw. 159, 160–61, 649 P.2d 737, 738 (1982). The Defendants–Appellees' burden was met in the instant case through the testimony of Army CID agent Foster and, ironically, the approval request and authorization documents that defense counsel objected to during the suppression hearing. *See supra* notes 1 and 10. Absent evidence to support the prosecution's claim of a primary military purpose, we must uphold the circuit court's conclusion that the joint civilian-military investigation violated the PCA, 10 U.S.C. § 375, and relevant federal regulations.

For the foregoing reasons, we agree with the circuit court's holding that "there is nothing here which indicates that this military operation was 'taken for the primary purpose of furthering a military ... function of the United States.'" Order at 6 (original emphasis omitted). Therefore, the only question remaining is whether the evidence must be suppressed.

### C. *The Exclusionary Rule*

The prosecution argues that the evidence should not be suppressed, even assuming that the PCA was violated, because (1) the Army CID did not act "precipitously in clear violation of the [PCA]" and (2) there is no history of PCA violations in this state. The Defendants–Appellees urge us to uphold the circuit court's suppression order based on a violation of article I, § 16 of the State Constitution, and under the basic tenets of the exclusionary rule.

■ The conclusion that the PCA was violated does not lead inexorably to a ruling that Defendants–Appellees are entitled to the remedy of suppression. "A defendant who seeks to benefit from the protections of the exclusionary rule has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also that his own constitutional rights were violated by the search and seizure challenged." *Scanlan,* 65 Haw. at 160–61, 649 P.2d at 738. The Defendants–Appellees do not provide, nor could we find, any support for the contention that article I, section 16 of the State Constitution provides a personal right to be free from military involvement in the investigation of civilian criminal activity. The only protection against such activity comes from the PCA.

■ Unlike the fourth amendment to the United States Constitution, the PCA does not spawn personal rights; therefore, exclusion is not theoretically necessary as an added deterrent to the serious criminal sanctions provided in the PCA. *See United States v. Walden,* 490 F.2d 372, 376–77 (4th Cir.), *cert. denied,* 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 *rehearing denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974). It should be noted, however, that during a hearing preceding the adoption of 10 U.S.C. § 375, a spokesperson for the Department of Justice admitted that "no one has been charged or prosecuted under the [PCA] since its enactment." Hse.Rep. No. 71, 97th Cong., 1st Sess. 1, 5 (1981), 1981 U.S.Code Cong. & Admin.News 1781, 1787. Nevertheless, the relevant federal regulations provide "no mechanism for enforcement and the [PCA] ... does not provide that '[t]he criminal is to go free because the constable has blundered.'" *Walden,* 490 F.2d at 376 (citing Judge Cardozo's opinion in *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926)). Consequently, "where a violation of the [PCA] is found or suspected, courts have generally found that creation or application

Cir.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *Lee v. State,* 513 P.2d 125 (Okla.Crim.1973), *cert. denied* 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974). Although we agree that evidence showing the military has exercised its authority "pervasively" in a specific case will sustain a finding that the PCA has been violated, the evidence need not rise to that level in order to establish a violation of the PCA. Where an investigation targeting civilians does not have the primary purpose of furthering a military function, even military involvement that falls short of participation in the search, seizure, or arrest of civilians may constitute a violation of the PCA. *See* discussion of 32 C.F.R. § 213.10, *supra* section III.A.

of an exclusionary rule is not warranted." *Hartley*, 796 F.2d at 115.[22]

Some courts have concluded, nonetheless, that exclusion of evidence obtained in violation of the PCA is permissible where a "need to deter future violations is demonstrated." *United States v. Roberts*, 779 F.2d at 568; *see also Walden*, 490 F.2d at 377 (indicating a willingness to consider adoption of an exclusionary rule "as a future deterrent" in the event of "widespread or repeated" violations of the PCA). However, contrary to the finding made by the circuit court, the record evidence in the instant case does not establish a pattern of PCA violations.[23]

Consequently, this case presents the issue whether a violation of federal statutory law that provides a penalty of its own may result in the suppression of evidence in a state court criminal proceeding. In *Lee v. Florida*, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968), the Court held that where local law enforcement authorities intercepted an individual's telephone conversations in violation of the Federal Communications Act of 1934 (Act) and then offered tapes of these conversations as evidence in a state court criminal proceeding, mandatory exclusion of evidence is the proper remedy notwithstanding the existence of penal provisions in the Act.[24] *Id.* at 386–87, 88 S.Ct. at 2101–02.

The Court primarily relied upon the judicially-devised exclusionary rule that was made applicable to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[25] *Lee v. Florida*, 392 U.S. at

**22.** *See also, e.g., United States v. Griley*, 814 F.2d 967, 976 (4th Cir.1987) (refusing to exclude evidence obtained after a search for stolen firearms at military dependent's on-base home; the defendant phoned his mother and told her to dispose of a bag in the attic of her off-base home; she asked a friend to do it, but the friend turned the rifle over to authorities); *United States v. Roberts*, 779 F.2d at 568 (noting that "the clear costs of applying an exclusionary rule are not countervailed by any discernible benefits" especially where the *unauthorized* use of Navy equipment in violation of the PCA was "unintentional and in good faith"); *United States v. Wolffs*, 594 F.2d 77 (5th Cir.1979) (refusing to consider whether CID investigators' act of disarming and detaining defendants violated PCA because application of exclusionary rule not warranted under *Walden*, *supra*); *United States v. Rasheed*, 802 F.Supp. 312, 324 (D.Haw.1992) (holding that there was no violation in a joint Navy/Coast Guard drug interdiction operation on the high seas, and inferring, in dicta, that "there is now no such need to deter future violations" of 10 U.S.C. § 375 based on the absence of any Ninth Circuit case applying the exclusionary rule to such violations); *State v. Danko*, 219 Kan. 490, 548 P.2d 819 (1976) (holding that "technical violation" of the PCA, where MP searched a civilian vehicle, did not warrant application of the extraordinary remedy of exclusion); *State v. Roberts*, 14 Kan.App.2d 173, 786 P.2d 630 (1990) (following *Walden* in factual circumstances broadly parallel to the instant case, but with a poorly developed record from the Defendants–Appellees' perspective).

**23.** At least one court in this jurisdiction has found a violation of the PCA. *See State v. Howard*, Crim. No. 93–0582 (1st Cir. Haw., Jan. 6, 1994), *appeal withdrawn by stipulation*, No. 17753, Order (Sept. 22, 1994). The record in the instant case reveals that defense counsel attempted to obtain Army CID records concerning the

dozens of prior occasions during which civilians were targeted by joint civilian-military investigations. However, in an order dated January 13, 1992, the circuit court denied that part of the Defendants–Appellees' motion seeking information concerning these other investigations. Because we resolve the issue of suppression on other grounds, we need not further address the question whether "widespread or repeated" violations of the PCA have taken place in this jurisdiction.

**24.** The Act expressly prohibited wilful or knowing divulgence of intercepted communications. *See* Federal Communications Act of 1934, Pub.L. No. 73–416, ch. 652, title VII, § 705, formerly title VI, § 605, 48 Stat. 1064, 1103 (1934) (codified as amended at 47 U.S.C. § 605 (1988)). Under the original enactment, violations carried penalties of not more than $10,000 or two years in prison, or both. *Id.*, ch. 652, title V, § 501, 48 Stat. 1064, 1100 (1934).

**25.** The exclusionary rule has applied in this jurisdiction even before Hawai'i became a state. *Territory v. Ho Me*, 26 Haw. 331 (1922); *see also State v. Pokini*, 45 Haw. 295, 308–09, 367 P.2d 499, 506 (1961). Furthermore, we observe that the cases supporting non-application of the exclusionary rule, *see supra* note 22, are all distinguishable. *Griley* is clearly distinguishable on its facts. The participation of the armed forces in *Hartley*, *United States v. Roberts*, and *Rasheed* were all limited to the use of military equipment. *Wolffs* and *Danko* were decided before the enactment of 10 U.S.C. § 375 and related legislation clarifying the PCA, *see supra* section III.A., and the record in *State v. Roberts* is inferior to that presented in the instant case. Finally, because the prosecution did not argue for the application of any exceptions to the exclusionary rule, we will not examine the issue.

385, 88 S.Ct. at 2100–01. The Court's decision in *Mapp* insured that states could not adopt rules of evidence calculated to permit the invasion of rights protected by federal law. The *Lee* Court buttressed its decision by reference to the "imperative of judicial integrity." *Id.* at 385–86, 88 S.Ct. at 2101 (citing *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960) and article VI of the United States Constitution).[26] More specifically, the Court noted that "it cannot be lawful to authorize [through judicial sanction] what is an illegal act." *Id.* at 385–86 n. 9, 88 S.Ct. at 2101 n. 9 (citation omitted). Furthermore, the Court added that its decision was "counseled by experience" because its research "failed to uncover a single reported prosecution of a law enforcement officer for violation of [the Act] since the statute was enacted." *Id.* at 386, 88 S.Ct. at 2101. Accordingly, the Court concluded that "nothing short of mandatory exclusion of the illegal evidence will compel respect for the federal law 'in the only effective way—by removing the incentive to disre-

gard it.'" *Id.* at 387, 88 S.Ct. at 2101 (citing *Elkins*, 364 U.S. at 217, 80 S.Ct. at 1444).

While we concur in the reasoning expressed in *Lee*, there are other independent and compelling state grounds that militate in favor of suppression in this case. The purpose of the exclusionary rule, as we see it, is primarily to deter illegal police conduct and secondarily to recognize that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts. *State v. Santiago*, 53 Haw. 254, 264, 492 P.2d 657, 663 (1971) (citing with approval the dissenting opinion in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which states that "[t]he objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system"); HRS § 602–4 (1985).[27] *See also State v. Kirn*, 70 Haw. 206, 767 P.2d 1238 (1989);[28]

---

**26.** Article VI of the United States Constitution provides in pertinent part that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding."

**27.** HRS § 602–4 provides that "[t]he supreme court shall have the general superintendence of all courts of inferior jurisdiction to *prevent and correct errors and abuses therein where no other remedy is expressly provided by law.*" (Emphases added.) This section "is merely a legislative restatement," and not the source, of the court's inherent powers. *Cf. Kukui Nuts of Hawaii, Inc. v. R. Baird & Co., Inc.*, 6 Haw.App. 431, 436, 726 P.2d 268, 271 (1986) (discussing HRS § 603–21.9 (1985), which lists the powers of the circuit courts).

**28.** In addition to the violation by the State of a defendant's constitutional rights, the court in *Kirn* indicated that "violation of a statute, or ... violation of an administrative rule adopted pursuant to HRS chapter 91 ...[,] since such rules have the force and effect of law[,]" can serve as the illegal act justifying suppression of otherwise admissible evidence. *Id.* at 208, 767 P.2d at 1240 (citations omitted). Specifically, the court stated that

> pretrial motions to suppress are not limited to admission of evidence which violates the Constitution. The scope of the motion to suppress is broader [than illegal searches and seizures]

and includes within its ambit the exclusion of evidence *illegally* obtained. McCormick on Evidence § 180, at 521 n. 10 (3d ed. 1984); Black's Law Dictionary 914 (5th ed. 1979); 29 Am.Jur.2d Evidence § 408, at nn. 4–5 (1967).

*Id.* at 208, 767 P.2d at 1239 (emphasis in original). Like many state courts that have decided this issue either for or against suppression, the court in *Kirn* did not carefully explain its authority to exclude evidence obtained through non-constitutional violations. Nevertheless, we have stated that

> courts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute.... Among courts' inherent powers are the powers "to create a remedy for a wrong even in the absence of specific statutory remedies[,]" ... and "to prevent unfair results." ... The courts also have inherent power to curb abuses and *promote a fair process which extends to the preclusion of evidence* [.]"

*Richardson v. Sport Shinko*, 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994) (emphasis added and citations omitted); *see also Peat, Marwick, Mitchell v. Superior Court*, 200 Cal.App.3d 272, 288, 245 Cal.Rptr. 873, 883 (1988); *State v. Moriwake*, 65 Haw. 47, 55, 647 P.2d 705, 711–12 (1982). Without the prerogative to call upon powers such as these, our courts would be disabled from performing their essential function of adjudicating cases in a fair manner and from protecting

*State v. Boynton,* 58 Haw. 530, 538, 574 P.2d 1330, 1335 (1978) (distinguishing evidence obtained in a search conducted by an informant who was recruited by the police from evidence that is "independently but perhaps illegally obtained" by private citizens). Consonant with these policies, we now hold that the evidence at issue in the instant case, which was obtained in violation of the PCA and then proffered in criminal proceedings against the Defendants–Appellees, must be suppressed under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state. Consequently, we uphold the circuit court's order suppressing the evidence—although it was based on the erroneous conclusion that the joint civilian-military investigations reflected a "repeated[,] . . . pervasive . . . pattern of conduct"—because the court was right for the wrong reasons. *Propios,* 76 Hawai'i at 486, 879 P.2d at 1069; *State v. Taniguchi,* 72 Haw. 235, 240, 815 P.2d 24, 26 (1991) ("where the decision below is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action").

As discussed above, the actions of the military CID personnel in concert with the HPD clearly violated the PCA and were therefore illegal. Evidence obtained as a result of illegal governmental action is tainted. *See Territory v. Ho Me,* 26 Haw. 331, 336–37 (1922) (expressing the court's unwillingness to hold that evidence illegally obtained "by federal officers may be retained by the city and county attorney and introduced in evidence upon trial of the defendant in a territorial court"). We hold that it is imperative in this case to suppress the evidence obtained in violation of the PCA because to ignore the violation and allow the evidence to be admitted would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state. In this instance, where government agents have clearly violated federal law, we conclude that the principles supporting the exclusionary rule in this state mandate suppression of the evidence.

Our holding is analogous to the *Elkins* doctrine wherein the United States Supreme Court rejected the so-called "silver platter" doctrine, *see* 364 U.S. at 208 & n. 2, 80 S.Ct. at 1439 & n. 2, which previously allowed State officers who had illegally obtained evidence in violation of the fourth amendment to the United States Constitution to provide it to federal officers for use in federal prosecutions. *See, e.g., Byars v. United States,* 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927) (declining to question the federal government's right to use evidence improperly seized by state officers). By focusing on the *legality* of the evidence used in federal criminal proceedings rather than its source,[29] the *Elkins* Court based its decision to suppress the evidence in part on the principle that courts have a supervisory responsibility to ensure that tainted evidence is not utilized in criminal prosecutions. 364 U.S. at 222–23, 80 S.Ct. at 1446–47; *cf. Weeks v. United States,*

---

their integrity and independence. However, the courts' inherent powers "must be exercised with restraint and discretion" and only in exceptional circumstances. *Kukui Nuts,* 6 Haw.App. at 438, 726 P.2d at 272. More importantly, invocation of a court's inherent power is legitimate only when reasonably necessary to effectuate its "judicial power," Haw. Const. art. VI, § 1, that is, when reasonably necessary to carry out and protect the court's constitutional authority. *Ramil v. Keller,* 68 Haw. 608, 619, 726 P.2d 254, 262 (1986) (citing HRS § 603–21.9(6) (1985), which is merely a legislative restatement and not the source of the circuit courts' inherent powers). Because necessity is the *sine qua non* of the legitimate exercise of a court's inherent powers, the critical question is whether the power to exclude evidence obtained in violation of the PCA is reasonably necessary to vindicate the court's authority. We believe that it is.

**29.** The *Elkins* Court was concerned with sanctioning the commission of crimes by the Government in order to secure the conviction of a private criminal. 364 U.S. at 223, 80 S.Ct. at 1447. Where the source of illegally obtained evidence is a private citizen who has acted independently of the government—for example, "the little old lady next door"—we have suggested that the exclusionary rule may not apply. *Boynton,* 58 Haw. at 538, 574 P.2d at 1335. However, we have not yet precluded the possibility that circumstances surrounding the illegal acquisition of information or evidence by a private citizen, which is later used against a defendant in a criminal trial, may be excluded in some future case on the basis that such action may constitute outrageous conduct in the constitutional sense.

232 U.S. 383, 392, 394, 34 S.Ct. 341, 344, 345, 58 L.Ed. 652 (1914).

"Where as here, evidence is obtained by the military and is offered in a civilian criminal proceeding, but the actions of the military personnel in acquiring the evidence are not shown to have been of such a manner as to be consistent with a military purpose in conformance with the PCA, the evidence is not admissible." *Tyler I,* 854 P.2d at 1370.[30] Permitting only the statutory remedy expressly contemplated under the PCA would obviate the court's necessary role in supervising state criminal prosecutions and would also amount to judicial sanction of federal law violations by federal military personnel. *Santiago,* 53 Haw. at 264, 266, 492 P.2d at 663, 664; *see also Elkins,* 364 U.S. at 222–23, 80 S.Ct. at 1446–47 (citing *Olmstead v. United States,* 277 U.S. 438, 469–71, 485, 48 S.Ct. 564, 569–70, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)).

Accordingly, we affirm the circuit court's Order granting in part the Defendants–Appellees' motion to suppress evidence in this case.

## IV. *CONCLUSION*

The controlled drug purchases by military personnel in this case represent illegal intrusions into the realm of civilian law enforcement. Although the targeting of civilians by military investigators will not amount to a violation of the Posse Comitatus Act (PCA) in every case, the prosecution failed to present evidence in the instant case showing that the military undertook its investigation to obtain evidence concerning either (1) illegal drug transactions involving military personnel, or (2) persons engaged in drug trafficking on a military installation. Given the absence of such proof, we hold that the evidence was properly suppressed under the

exclusionary rule as applied in Hawai'i. Accordingly, we affirm.

RAMIL, Justice, concurring in opinion in which MOON, Chief Justice, joins.

### I.

I agree with the majority's explication of the federal Posse Comitatus Act (PCA), as well as the majority's application of the PCA to the facts of the case before us. I also agree that the evidence obtained in violation of the PCA should be suppressed on adequate and independent state grounds via the exclusionary rule as applied in the State of Hawai'i. However, because I believe the majority's justification for applying the exclusionary rule in this case is potentially overbroad, I write separately to illustrate my own concept of how the State of Hawai'i's counterpart to the federal exclusionary rule should be applied. In so doing, I hope to explain why this appeal represents an exception to our general rule that before a defendant may benefit from the protections of the exclusionary rule, he or she must demonstrate the violation of a constitutional right. *See* majority at 466, 896 P.2d at 922 (citing *State v. Scanlan,* 65 Haw. 159, 160–161, 649 P.2d 737, 738 (1982)).

In my view, the exclusionary rule should generally apply only in situations where the evidence in question was obtained in violation of an individual's *constitutional* rights. Thus, when governmental agents obtain evidence of a crime without violating any constitutional rights, the exclusionary rule should only be applied in very limited situations. In the instant case, the majority seems to justify its invocation of the exclusionary rule solely on the basis that governmental agents violated a federal law in the course of obtaining the evidence in question. In my opinion, the violation of *any* law by a governmental

---

**30.** The challenged evidence pertaining to Counts IX, X, and the Additional Count was obtained pursuant to a search warrant that was "based *in part* on the transaction of August 15, 1990." (Emphasis added.) It is conceivable that the evidence and circumstances relating to Counts I through III, which were developed as a result of independent investigations by the HPD, are also cited in the affidavit supporting the warrant request. *See State v. Brighter,* 63 Haw. 95, 621

P.2d 374 (1980). However, the record does not contain either the search warrant or any affidavit that might otherwise support such a contention. Furthermore, the prosecution does not challenge the court's finding in FOF 16 that the search warrant was issued "[a]s a result of" the military drug buys. Accordingly, we are obliged to uphold the entirety of the circuit court's order suppressing the evidence related to Counts IV through X and the Additional Count.

agent simply does not provide a sufficiently narrow category for invoking an exception to the exclusionary rule. Rather, we must approach these situations on a case-by-case basis to determine whether the rationales underlying our exclusionary rule are served, and whether the law violated warrants its application. I therefore feel compelled to delineate the reasons why the exclusionary rule applies in cases such as the one before us, where the prosecution seeks to introduce evidence obtained in accordance with the requirements of our state and federal constitutions, but in violation of the PCA. For these reasons, and for the reasons set forth below, I respectfully concur.

## II.

The policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in our nation's history. *United States v. Walden*, 490 F.2d 372, 375 (4th Cir.), *cert. denied*, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760, *rehearing denied*, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974). Indeed, strong opposition to military encroachment into civil affairs existed prior to the Revolutionary War and has periodically resurfaced in this country ever since. *See* Clarence I. Meeks, *Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Comitatus Act*, 69 Mil.L.Rev. 83, 86 (1975). One of the major concerns facing the delegates at the Constitutional Convention in 1787 was how to handle their fear of a standing army. *Id.* at 87; *see also Walden*, 490 F.2d at 375. The issue of the proper role of a national military was also raised in the states during the ratification process and is reflected in the Bill of Rights.[1] Meeks, *supra*, at 87–88. During the Civil War, the aversion toward using the military to aid civil law enforcement slowly began to erode. *Id.* at 89–90. However, gross abuses during the Reconstruction Era precipitated the enactment of the Posse Comitatus Act.[2] *Id.* at 89.

Since then, our country's antipathy toward the use of the military in civilian law enforcement has remained strong. Chief Justice Burger expressed this sentiment in *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), a case involving a challenge to surveillance by the United States Army of civilian political activities during peacetime.[3]

The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint[4] —reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully em-

---

1. For example, our country's resistance to any military intrusion into civilian affairs "found early expression ... in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2326–27, 33 L.Ed.2d 154 (1972).

2. Until the passage of the PCA in 1878, the improper use of troops in Southern states included, *inter alia*, aiding in the execution of local laws, controlling striking workers, and collecting taxes. Meeks, *supra*, at 89–92.

3. In a 5–4 decision, a majority of the Court held that a justiciable controversy did not exist because the plaintiffs lacked standing.

4. The complaint alleged, *inter alia*, that the Army maintained files on membership, ideology, programs, and practices of virtually every activist political group in the country, including the American Civil Liberties Union and the National Association for the Advancement of Colored People. *Tatum*, 408 U.S. at 24–25, 92 S.Ct. at 2330–31. It also alleged that the Army used undercover agents to infiltrate these civilian groups and to reach into confidential files of students and other groups. *Id.* at 25, 92 S.Ct. at 2331. The Army allegedly then distributed the information it collected from the agents, as well as data collected from using various forms of electronic surveillance, to state federal and local governmental officials. *Id.*

powered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

*Tatum,* 408 U.S. at 15–16, 92 S.Ct. at 2326–27.

Trepidation toward the notion of military involvement in civilian law enforcement is particularly prominent in the State of Hawai'i. Indeed, many of our citizens still remember the period during World War II when Hawai'i existed under martial law.[5] The impact was felt by every citizen from the moment martial law was declared upon the Territory of Hawai'i on December 7, 1941, to the moment blackout and curfew were finally lifted on July 11, 1945. *See* J. Garner Anthony, *Hawaii Under Army Rule* ix–x (1955) (providing a chronological list of principal events relating to military control of civil affairs in Hawai'i during World War II). *See also* Jon M. Van Dyke, *Duncan v. Kahanamoku,* 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946), in *Government Under Martial Law, A Humanities Exhibit,* 17 (1991) (describing some of the conditions that people living in the Territory of Hawai'i were forced to endure during the time Hawai'i existed under martial law). During this time period, almost every aspect of civilian life was monitored and controlled by the new military regime. *See* J. Garner Anthony, *Martial Law, Military Government and the Writ of Habeas Corpus in Hawaii,* 31 Cal.L.Rev. 477, 479–82 (1943).

As described by United States Supreme Court Justice Hugo L. Black:

[t]he Military authorities took over the government of Hawaii. They could and did, by simply promulgating orders, govern the day to day activities of civilians who lived, worked, or were merely passing through there. The military tribunals interpreted the very orders promulgated by the military authorities and proceeded to punish violators. The sentences imposed were not subject to direct appellate court review, since it had long been established that military tribunals are not part of our judicial system.... Military tribunals could punish violators of these orders by fine, imprisonment or death.

*Duncan v. Kahanamoku,* 327 U.S. 304, 309, 66 S.Ct. 606, 608, 90 L.Ed. 688 (1946).

In *Duncan,* the petitioners, two civilians who were tried, convicted and sentenced to prison by military tribunals,[6] challenged the authority of the military on both statutory and constitutional grounds. *Id.* at 307–11, 66 S.Ct. at 607–09. The Supreme Court ultimately held that the armed forces acted in violation of statutory authority and clearly exceeded the boundaries between military and civilian power. *Id.* at 324, 66 S.Ct. at 615–16. In reaching this holding Justice Black explained: *"The established principle of every free people is, that the law shall alone govern; and to it the military must always yield...."*[7] *Id.* at 323, 66 S.Ct. at 615 (emphasis added and citation omitted).

---

5. Martial law "[e]xists when military authorities carry on government or exercise various degrees of control over civilians or civilian authorities in domestic territory." *Black's Law Dictionary* 974 (6th ed. 1990).

6. One of the petitioners, Harry E. White, was charged with embezzling stock more than eight months after the Pearl Harbor attack. *Duncan,* 327 U.S. at 309, 66 S.Ct. at 608–09. The other, Lloyd C. Duncan, was charged with assault more than two years after the Pearl Harbor attack. *Id.* at 310, 66 S.Ct. at 609.

7. Justice Murphy concurred in the Court's decision. In his concurring opinion he forcefully stated:

Abhorrence of military rule is ingrained in our form of government. Those who founded this nation ... shed their blood to win independence from a ruler who they alleged was attempting to render the 'Military independent of and superior to the Civil power.' ... In the earliest state constitutions they inserted definite provisions placing the military under 'strict subordination' to the civil power at all times and in all cases. And in framing the Bill of Rights of the Federal Constitution they were careful to make sure that the power to punish would rest primarily with civil authorities at all times.... *This supremacy of the civil over the military is one of our great heritages. It has made possible the attainment of a high degree of liberty regulated by law rather than caprice. Our duty is to give effect to that heritage at all times, that it may be handed down untarnished to future generations.*

While the Supreme Court's decision in *Duncan* represents a strong reminder of the principles of freedom upon which the United States was founded, it also serves as a valuable reminder that these freedoms were largely forgotten during the period of World War II when Hawai'i existed under martial law. *See* Van Dyke, *supra*, at 19. There is no question that the history in this state exemplifies the potential dangers that exist when civilian life is under military rule. Nor is there any question that our history also demonstrates the importance of being vigilant with respect to the dangers sought to be averted by the enactment of the PCA in 1878. This is particularly true in peacetime when there is no ostensible justification for the intrusion. It is also true when we are dealing with incidents, such as the one before us, where the impact is not felt on a large scale. Indeed, "when a government wishes to deprive its citizens of freedom, and reduce them to slavery, it generally makes use of a standing army. That danger ... exists not only in bold acts of usurpation of power, *but also in gradual encroachments.*" *Tatum*, 408 U.S. at 18, 92 S.Ct. at 2328 (Douglas, J., dissenting) (emphasis added & internal quotation marks omitted).

Thus, because of the importance of the PCA stemming from the traditional American antipathy towards military involvement in civilian affairs, and the historical significance of military governance in the Territory of Hawai'i during World War II, we simply cannot wait for "widespread and repeated" violations of the PCA before invoking our counterpart to the federal exclusionary rule as a deterrent to potential future violations.[8] And, while the PCA, as many courts have noted, contains its own independent mechanism for enforcement, *i.e.,* "serious criminal sanctions," *see* majority at 466, 896 P.2d at 922, I find it significant, as the Supreme Court did in *Lee v. Florida*, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968) with respect to the FCA, that no one has been charged or prosecuted under the PCA since its enactment in 1865. Clearly, the only existing "deterrent" is not much of deterrent at all.[9]

### III.

Accordingly, for the foregoing reasons, I respectfully concur in the majority's holding that the evidence obtained in violation of the PCA in the instant case must be suppressed on adequate and independent state grounds via the Hawai'i exclusionary rule. As discussed *supra*, I write separately only to emphasize why I believe that the PCA warrants applying an exception to the general rule that in order to derive the benefits of our state counterpart to the federal exclusionary rule, a defendant must demonstrate a violation of his or her constitutional rights.

---

*Duncan,* 327 U.S. at 324, 66 S.Ct. at 616 (Murphy, J., concurring) (emphasis added).

**8.** I find it ironic that several courts, including the majority, that have found violations of the PCA or similar provisions, have concluded that there has not been "widespread or repeated" violations. However, because I see no need to wait for widespread and repeated violations, the point is irrelevant.

**9.** Moreover, as the majority recognizes, another rationale behind our exclusionary rule, *i.e.,* the imperative of judicial integrity, is also served in this case. Indeed, " '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, disregard the char-

ter of its own existence." *State v. Santiago*, 53 Haw. 254, 264, 492 P.2d 657, 663 (1971) (quoting *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961)). And, as the Supreme Court stated in *Lee v. Florida, supra,* "no court, state or federal, may serve as an accomplice in the willful transgression of 'the Laws of the United States,' Laws by which 'the Judges in every State [are] bound....'" *Id.* 392 U.S. at 386, 88 S.Ct. at 2101 (citing Art. VI, U.S. Const.). While, in my view, this principle must be exercised with caution, the instant case represents an appropriate circumstance for its invocation.